UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

DERRICK BELL,

Petitioner,

v.

DAVID L. MILLER, Superintendent of
Eastern Correctional Facility, and ELIOT
SPITZER, Attorney General of New York,
and John Doe, Superintendent of a New
York State Correctional Facility

Respondents.



Case No. _____

ORIGINAL

CV 05 663

ROSS, J.

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

FEB 0 3 2005

*BROOKLYN OFFICE

## MEMORANDUM OF LAW IN SUPPORT OF
## PETITION UNDER 28 U.S.C. § 2254 FOR WRIT OF
## HABEAS CORPUS BY A PERSON IN STATE CUSTODY

Anne S. Raish
(AR 8643)

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019-6064
(212) 373-3000

Lara M. Shalov
(LS 6540)

STILLMAN & FRIEDMAN, P.C.
425 Park Avenue
New York, New York 10022
(212) 223-0200

Of Counsel:
Laura R. Johnson
(LJ 4800)
Lawrence T. Hausman
(LH 4542)

THE LEGAL AID SOCIETY
199 Water Street (5th Floor)
New York, New York 10038
(212) 577-7989

Of Counsel:
Mark F. Pomerantz
(MP 9156)

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019-6064
(212) 373-3000

Attorneys for Petitioner

## TABLE OF CONTENTS

Preliminary Statement ........................................................................................................ 1

Questions Presented........................................................................................................... 7

Statement of Facts.............................................................................................................. 8

Argument .......................................................................................................................... 38

I.   Petitioner Was Denied the Effective Assistance of Counsel and His Right
     to Due Process Because His Trial Counsel Unreasonably Failed to Refute
     the Only Piece of Evidence Against Petitioner in the Case and
     Demonstrated a Lack of Knowledge and Understanding of Basic
     Principles of Criminal Law.....................................................................................41

     A.   Trial Counsel Unreasonably Failed to Consult a Medical Expert
          Concerning the Unreliability of the Complaining Witness's Identification .....44

     B.   Trial Counsel Failed to Introduce into Evidence Statements in a
          Police Report Contradicting the Complaining Witness's Identification
          Testimony..........................................................................................................56

     C.   Trial Counsel Failed to Object to the Introduction of Inadmissible,
          Highly Prejudicial and Non-Probative Evidence...............................................63

     D.   Trial Counsel Failed to Exercise a Peremptory Strike........................................67

     E.   Trial Counsel Failed to Make an Adequate Motion to Dismiss the
          Charge of Robbery..............................................................................................68

     F.   This Court Should Review De Novo the State Motion Court's
          Disposition of Petitioner's Federal Constitutional Claims ...............................69

     G.   The Rejection of Petitioner's Ineffective Assistance Of Counsel
          Claim by the State Appellate Court and the State Motion Court
          Was an Unreasonable Application of *Strickland* ...............................................71

     H.   There Is No Procedural Bar to Habeas Relief.....................................................79

II.  Petitioner Was Denied His Right To Due Process Because Insufficient
     Evidence Was Presented At Trial To Enable Any Rational Trier Of Fact
     To Conclude Beyond A Reasonable Doubt That A Robbery Occurred................82

Conclusion........................................................................................................................ 87

i

## TABLE OF AUTHORITIES

### CASES

*Aguirre* v. *Alameida,* No. 03-56795, 2005 WL 176243 (9th Cir. Jan. 27, 2005)........53, 54

*Aparicio* v. *Artuz,* 269 F.3d 78 (2d Cir. 2001)..........................................................39, 69, 70

*Bell* v. *Cone,* 535 U.S. 685 (2002)..........................................................................40, 41

*Birt* v. *Montgomery,* 709 F.2d 690 (7th Cir. 1983), *cert. denied,* 469 U.S. 874 (1984)...........................................................................................................................42

*Blackburn* v. *Foltz,* 828 F.2d 1177 (6th Cir. 1987), *cert. denied,* 485 U.S. 970 (1988)....................................................................................................................57, 58

*Bryant* v. *Scott,* 28 F.3d 1411 (5th Cir. 1994) ..............................................................42, 57

*Bonilla* v. *Portuondo,* 00 Civ. 2369, 2004 U.S. Dist. LEXIS 2774 (S.D.N.Y. Feb. 26, 2004)........................................................................................................79

*Cotto* v. *Herbert,* 331 F.3d 217 (2d Cir. 2003)............................................................79

*Dunaway* v. *New York,* 442 U.S. 200 (1979)...............................................................11

*Eze* v. *Senkowski,* 321 F.3d 110 (2d Cir. 2003).................................39, 45, 49, 50, 69, 70

*Fiore* v. *White,* 531 U.S. 225 (2001) ..........................................................................82

*Francis S.* v. *Stone,* 221 F.3d 100 (2d Cir. 2000).................................................40, 41, 75

*Garcia* v. *Carey,* No. 02-56895, 2005 WL 107090 (9th Cir. Jan. 20, 2005).....................83

*Garcia* v. *Lewis,* 188 F.3d 71 (2d Cir. 1999)............................................................70, 79

*Garcia* v. *Portuondo,* No. 03 Civ. 2458, 2003 WL 22510390, *modified on other grounds,* 104 Fed. Appx. 776, 2004 WL 1612675 (2d Cir. 2004) ..........................78

*Gersten* v. *Senkowski,* 299 F. Supp. 2d 84 (E.D.N.Y. 2004).........................................45

*Harris* v. *Artuz,* 288 F. Supp. 2d 247 (E.D.N.Y. 2003), *aff'd,* 100 Fed. Appx. 56 (2d Cir. 2004)....................................................................................................57, 58

*Harris* v. *Reed,* 489 U.S. 255 (1989)......................................................................70, 75

*Harrison* v. *People,* 50 N.Y. 518 (1872) ....................................................................85

*Henderson* v. *Sargent*, 926 F.2d 706 (8th Cir. 1991), *cert. denied*, 502 U.S. 1050 (1992)...................................................................................................................57

*Henry* v. *Scully*, 918 F. Supp. 693 (S.D.N.Y. 1988)...........................................66, 67

*Holsomback* v. *White*, 133 F.3d 1382 (11th Cir. 1998)...............................................43

*House* v. *Balkcom*, 725 F.2d 608 (11th Cir.), *cert. denied*, 469 U.S. 870 (1984) ............42

*Jackson* v. *Virginia*, 443 U.S. 307 (1979) .......................................................82, 83

*Kimmelman* v. *Morrison*, 477 U.S. 365 (1986) ..................................42, 63, 64, 81

*Lee* v. *Kemna*, 534 U.S. 362 (2002) ...................................................................79

*Lindstadt* v. *Keane*, 239 F.3d 191 (2d Cir. 2001) .....................................44, 56, 63

*Lockyer* v. *Andrade*, 538 U.S. 63 (2003)........................................................40, 41

*Maddox* v. *Lord*, 818 F.2d 1058 (2d Cir. 1987) .......................................................53

*Manson* v. *Brathwaite*, 432 U.S. 98 (1977)..........................................................51

*Mason* v. *Scully*, 16 F.3d 38 ...............................................................................67

*Massaro* v. *United States*, 538 U.S. 500 (2003) .....................................................80

*Miller* v. *Senkowski*, 268 F. Supp. 2d 296 (E.D.N.Y. 2003) ...........................45, 46, 58, 56

*Murray* v. *Donlan*, 77 A.D.2d 337 (2d Dep't 1980)...........................................59, 60

*Nixon* v. *Newsome*, 888 F.2d 112 (11th Cir. 1989) ...........................................57, 59

*Pavel* v. *Hollins*, 261 F.3d 210 (2d Cir. 2001) ...........................................43, 44, 46, 49, 72

*People* v. *Alvino*, 71 N.Y.2d 233 (1987) .......................................................64, 65

*People* v. *Bell*, 99 N.Y.2d 555 (2002) .............................................................6, 31

*People* v. *Bell*, 298 A.D.2d 398 (2d Dep't 2002) ...........................................5, 31, 86

*People* v. *Bell*, No. 2004-09580..........................................................................7

*People* v. *Brown*, 45 N.Y.2d 852, 410 N.Y.S.2d 287 (1978) ...........................................80

*People* v. *Buie*, 86 N.Y.2d 501 (1995) .................................................................61

*People* v. *Carter*, 227 A.D.2d 661 (3d Dep't 1996) .............................................................59

*People* v. *Colon*, 187 A.D.2d 445 (2d Dep't 1992).............................................................62

*People* v. *Contes*, 60 N.Y.2d 620 (N.Y. 1983).......................................................................82

*People* v. *Cotto*, 92 N.Y.2d 68 (1998)................................................................................62

*People* v. *Crawford*, 183 A.D.2d 0775 (2d Dep't 1992) .................................................52, 77

*People* v. *Cruz*, 88 A.D.2d 621 (2d Dep't 1982) ......................................................................59

*People* v. *Daniels*, 102 Misc.2d 540 (Sup. Ct. 1979) ...............................................................55

*People* v. *Dingle*, 122 A.D.2d 280 (2d Dep't 1986)...............................................................85

*People* v. *Dokes*, 79 N.Y.2d 656 (1992)...........................................................................66, 73

*People* v. *Donaldson*, 1 A.D.3d 800, 801 (3d Dep't 2003) ....................................................80

*People* v. *Fu Chen*, 293 A.D.2d 362 (1st Dep't 2002) ............................................................80

*People* v. *Gray*, 86 N.Y.2d 10 (1995)...................................................................................68

*People* v. *Jennings*, 69 N.Y.2d 103 (1986)............................................................................84

*People* v. *Kearse*, 289 A.D.2d 507 (2d Dep't 2001) .............................................................84

*People* v. *Kelley*, 220 A.D.2d 456 (2d Dep't 1995) ...............................................................77

*People* v. *Lee*, 96 N.Y.2d 157 (2001)...............................................................................52, 77

*People* v. *Logan*, 2 A.D.3d 1392 (4th Dep't 2003) ................................................................80

*People* v. *Maisonave*, 140 A.D.2d 545 (2d Dep't 1988) ....................................................58, 60

*People* v. *Malagon*, 50 N.Y.2d 954 (N.Y. 1980).....................................................................84

*People* v. *Martin*, 235 A.D.2d 551 (2d Dep't 1997).................................................................55

*People* v. *Miller*, No. 2003-213, 2004 WL 615136 (N.Y. Co. Ct. Mar. 18, 2004) ...........55

*People* v. *Molineux*, 168 N.Y. 264 (1901).........................................................................64, 65

*People* v. *Olive*, 52 N.Y.2d 309 (1981) ................................................................................85

*People* v. *Real*, 137 A.D.2d 416 (1st Dep't 1988)..................................................................77

*People* v. *Reynolds*, 309 A.D.2d 976 (3d Dep't 2003)..........................................................80, 81

*People* v. *Rivera*, 71 N.Y.2d 705, 530 N.Y.S.2d 52 (1988) ....................................................80

*People* v. *Rodriguez*, 79 N.Y.2d 445 (1992) ....................................................................7, 11

*People* v. *Sandoval*, 34 N.Y.2d 371 (1974)........................................4, 5, 13, 65, 66, 72, 73

*People* v. *Santarelli*, 49 N.Y.2d 241 (1980).........................................................64, 65, 66, 67

*People* v. *Selassie*, 140 Misc. 2d 616 (Sup. Ct., Bronx Cty. 1988)...............................60, 61

*People* v. *Seminara*, 58 A.D.2d 841, 396 N.Y.S.2d 472 (2nd Dep't 1977) ......................81

*People* v. *Sepulveda*, 105 A.D.2d 854 (2d Dep't 1985) ........................................................59

*People* v. *Sims*, 55 A.D.2d 629 (2d Dep't 1976) ..................................................................67

*People* v. *Stewart*, 295 A.D.2d 249 (1st Dep't 2002)............................................................80

*People* v. *Stultz*, 2 N.Y.3d 277, 284-85 (2004).....................................................................80

*People* v. *Taborn*, 292 A.D.2d 200 (1st Dep't 2002) ...........................................................80

*People* v. *Ventimiglia*, 52 N.Y.2d 350 (1981) .......................................................................65

*People* v. *Vinson*, 104 Misc. 2d 664 (Sup. Ct., West. Cty. 1980) .......................................55

*People* v. *Welch*, 108 A.D.2d 1020, 485 N.Y.S.2d 590 (3rd Dep't 1985) .........................81

*Quartararo* v. *Fogg*, 679 F. Supp. 212 (E.D.N.Y. 1988)..................................................63, 64

*Richey* v. *Mitchell*, No. 01-3477, 2005 WL 147080................................................................83

*Robillard* v. *Robbins*, 168 A.D.2d 803 (3d Dep't 1990) ..................................................52, 77

*Rogers* v. *Israel*, 746 F.2d 1288 (7th Cir. 1984)...................................................................45

*Sanders* v. *Ratelle*, 21 F.3d 1446 (9th Cir. 1994) ................................................................42

*Schell* v. *Witek*, 218 F.3d 1017 (9th Cir. 2000) ...................................................................45

*Sellan* v. *Kuhlman*, 261 F.3d 303 (2d Cir. 2001).................................................................39

*Simmons* v. *United States*, 390 U.S. 377 (1968)..................................................................................51

*State* v. *Cronin*, 60 N.Y.2d 430 (1983)................................................................................................77

*Strickland* v. *Washington*, 466 U.S. 668 (1984)...................................30, 36, 39, 41, 42, 43, 54, 63, 70, 71, 75, 81

*Thomas* v. *Kuhlman*, 255 F. Supp. 2d 99 (E.D.N.Y. 2003)......................................45, 47, 50

*United States* v. *Doe*, 365 F.3d 150 (2d Cir. 2004) .................................................................80

*United States* v. *Garth*, 188 F.3d 99 (3d Cir. 1999) ................................................................83

*United States* v. *Gray*, 878 F.2d 702 (3d Cir. 1989)........................................................42, 43

*United States* v. *Schwarz*, 283 F.3d 76 (2d Cir. 2002) ...........................................................83

*United States* v. *Tucker*, 716 F.2d 576 (9th Cir. 1983)............................................................45

*United States* v. *Wade*, 388 U.S. 218 (1967) ...................................................................11, 51

*Washington* v. *Schriver*, 255 F.3d 35 (2d Cir. 2001)...............................................................69

*Wiggins* v. *Smith*, 539 U.S. 510 (2003) ..............................................................39, 43, 44, 71, 72

*Williams* v. *Taylor*, 529 U.S. 362 (2000)..............................................................39, 40, 41, 43

*Williams* v. *Washington*, 59 F.3d 673 (7th Cir. 1995)......................................................43, 56

*In re Winship*, 397 U.S. 358 (1970).....................................................................................82

## STATUTES

U.S. Const., Amend. VI.............................................................................................................7

U.S. Const., Amend. XIV ....................................................................................................7, 8, 9

28 U.S.C. § 2254.....................................................................................1, 38, 40, 78, 82

C.P.L. § 270.15 ................................15, 31, 32, 33, 34, 37, 38, 65, 66, 67, 69, 73, 79, 80, 81

C.P.L. § 440.10 ..............................................................................................6, 35, 48, 69, 80, 81

C.P.L. § 450.15(1) ..................................................................................................................    7

C.P.L. § 460.10(4) ...........................................................................................................7

P.L. § 10.00(6)..........................................................................................13, 25, 83, 84

P.L. § 120.05-6 ...............................................................................................................1

P.L. § 150.05................................................................................................................68

P.L. § 160.15-1 ..............................................................................................................1

## **Preliminary Statement**

Derrick Bell, an inmate incarcerated at Eastern Correctional Facility in Napanoch, New York, petitions for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. He submits this memorandum of law in support of the petition.[1]

Following a jury trial before New York State Supreme Court Justice James G. Starkey, petitioner was convicted, under Indictment 10851/96, of first-degree robbery (New York Penal Law § 160.15-1) and second-degree assault (New York Penal Law § 120.05-6). On May 27, 1997, the court sentenced petitioner to an indeterminate sentence of incarceration of twelve-and-a-half to twenty-five years on the robbery count and a concurrent, indeterminate sentence of three-and-a-half to seven years on the assault count. Petitioner remains incarcerated pursuant to this judgment.

This Court should grant Derrick Bell's petition for a writ of habeas corpus because the state courts' rejection of his claims that his trial counsel rendered ineffective assistance and that insufficient evidence was presented to enable the jury to convict him

---

[1]   Petitioner informed undersigned counsel on February 2, 2005 that he was notified on that day by prison authorities that he would be transferred to a different facility. Prison authorities refused to inform petitioner where he will be moved or when. Undersigned counsel for petitioner contacted the Inmate Records Coordinator at Eastern Correctional Facility, Ms. Angie Delgaizl, on February 2, 2005 to inquire where and when petitioner will be transferred so that undersigned counsel would be able to name the appropriate superintendant as respondent. Ms. Delgaizl refused to disclose to undersigned counsel where and when petitioner will be moved. Accordingly, undersigned counsel has included an as yet unknown John Doe respondent and will move to amend the caption to reflect the identity of petitioner's successor custodian as soon as information concerning petitioner's place of incarceration becomes available.

of first-degree robbery constituted an unreasonable application of clearly established federal law.

Derrick Bell was not given a fair trial. His trial was fatally infected with serious constitutional error. The *only* evidence connecting petitioner to the crimes for which he was convicted was an identification by the complaining witness that was fraught with unreliability. Trial counsel utterly failed to investigate or pursue the unreliability of this identification evidence. On July 16, 1996, at roughly 2:30 AM, the complaining witness, Brentonol Moriah, was held up at gun point and shot in the leg. When police officers arrived on the scene of the crime, Mr. Moriah gave a detailed description of his assailant to the police as "a black man wearing a lemon-yellow shirt." The police reports describing the crime scene expressly list the assailant's identity as "unknown" and "unidentified."

Soon after Mr. Moriah spoke to responding police officers, he was rushed to the hospital. He was placed under anesthesia in order to undergo surgery. Following his surgery, Mr. Moriah remained in the intensive care unit for ten to twelve days during which time amnestic and anxiolytic drugs were administered to him to keep him heavily sedated. It was only after Mr. Moriah awoke from this lengthy period of drug-induced sedation that he identified his assailant as his former neighbor and housemate, Mr. Bell.

At trial, the only evidence connecting Mr. Bell to these crimes was Mr. Moriah's identification testimony. The key issue in the case was therefore whether Mr. Moriah's identification of Mr. Bell was reliable and credible. Despite the centrality

2

of Mr. Moriah's identification of Mr. Bell, Mr. Bell's trial attorney, Mr. Fredy H. Kaplan, Esq., completely failed to investigate the reliability of Mr. Moriah's identification of Mr. Bell.   There were a number of factors that should have led Mr. Kaplan to investigate the reliability of the identification -- and a reasonably competent attorney would have conducted such an investigation:  First, Mr. Moriah said that he knew his assailant as his former neighbor with whom he had shared a kitchen and bath and that he stood face to face with his assailant for a full five minutes during the incident.  Yet, *Mr. Moriah failed to identify Mr. Bell as his assailant at the scene of the crime.*  Second, Mr. Moriah testified by videotape before the Grand Jury several weeks after the crime occurred that he continued to experience memory lapses.  Third, Mr. Moriah testified at the pre-trial hearing that he did not recall talking to the police at the scene of the crime.  Fourth, Mr. Moriah lost over half of his blood as a result of the gun shot, lost consciousness and was deeply sedated on narcotics and amnestic drugs for more than 10 days before regaining consciousness.  He only identified Mr. Bell as his assailant shortly after emerging from unconsciousness.  These numerous idiosyncrasies would have led a reasonably competent attorney to ponder the effect of the trauma on Mr. Moriah's identification and, therefore, to realize the need to consult an expert witness regarding the reliability of Mr. Moriah's identification of Mr. Bell.

Despite the unreliability of the only evidence in the case against petitioner, petitioner's trial counsel failed to investigate or pursue the weakness of that evidence. Because the complainant's identification of Mr. Bell was the only evidence connecting Mr. Bell to the crime, because the police reports from the scene of the crime were

3

inconsistent with the complainant's belated identification of petitioner, and because the complainant suffered severe trauma and only identified Mr. Bell as his assailant after awaking from a prolonged period of drug-induced sedation, any reasonably competent attorney would have considered consulting an expert to investigate the reasons for the complainant's belated identification of Mr. Bell. Had trial counsel done so, a medical expert would have cast serious doubts about the reliability of the identification testimony. Yet, trial counsel's failure was, by his own admission, not the result of a strategic decision. Accordingly, trial counsel provided ineffective assistance.

In addition to trial counsel's failure to investigate the unreliability of the only evidence against petitioner, trial counsel was also ineffective in several other critical respects. Trial counsel failed to recognize that certain testimony about Mr. Bell's purportedly bad character and purportedly bad acts should not have been introduced into evidence. The prosecution introduced lengthy testimony by Mr. Bell's landlord concerning Mr. Bell's failure to pay rent, Mr. Bell's allegedly angry behavior, and his forced entry into his apartment house. Although this evidence was irrelevant and unduly prejudicial and should have been excluded, trial counsel did not object to the introduction of this evidence.

Trial counsel also failed to object when the prosecution's impeachment of Mr. Bell on cross-examination violated the court's *Sandoval* ruling. Additionally, trial counsel failed to exercise a peremptory strike and thereby denied petitioner his right to be tried by a jury of his choosing. Trial counsel also failed to impeach the complainant's identification testimony by introducing his prior inconsistent statement concerning the

4

identity of his assailant. Finally, trial counsel failed to make an adequate motion to dismiss the charge of robbery.

Despite the fact that no evidence was admitted at trial suggesting that any property of the complainant was taken by the assailant, the jury convicted petitioner of first-degree robbery and second-degree assault. Three alibi witnesses and petitioner provided consistent testimony that petitioner was somewhere else at the time the crime occurred.

Petitioner filed a timely notice of appeal. Among the issues raised on appeal was ineffective assistance of counsel as set forth in the trial record. See Declaration of Anne S. Raish, Esq., sworn to February 3, 2005 ("Raish Decl."), Ex. A (Brief for Defendant-Appellant, dated April 12, 2002). Petitioner asserted that his attorney failed to impeach the complaining witness's identification testimony by introducing his prior inconsistent statement concerning the identity of his assailant, failed to object to the introduction of highly prejudicial, non-probative evidence, failed to object to the prosecution's impeachment of petitioner in violation of the court's *Sandoval* ruling, failed to exercise a peremptory strike, and failed to make an adequate motion to dismiss the charge of robbery. Petitioner also argues that there was insufficient evidence presented at trial to convict him of first-degree robbery.

On October 2, 2002, the Appellate Division, Second Department, affirmed the conviction. *See* Raish Decl., Ex. B. (*People v. Bell*, 298 A.D.2d 398 (2d Dep't 2002)). The New York Court of Appeals denied petitioner leave to appeal on

5

December 11, 2002. *See* Raish Decl., Ex. C (*People* v. *Bell*, 99 N.Y.2d 555 (2002) (Smith, G.B.)). On the direct appeal, petitioner was represented by M. Sue Wycoff, succeeded by Laura R. Johnson, of The Legal Aid Society, Criminal Appeals Bureau and co-counsel Lara M. Shalov of Paul, Weiss, Rifkind, Wharton & Garrison LLP. *See* Raish Decl., Exs. D and E.

On February 13, 2004, petitioner, by appellate counsel, filed a motion to vacate the judgment of conviction pursuant to New York Criminal Procedure Law ("C.P.L.") § 440.10(1)(h). *See* Raish Decl., Ex. F (Notice of C.P.L. § 440.10(1)(h) Motion and annexed affirmation of Anne S. Raish and Memorandum of Law, dated February 13, 2004). On the motion to set aside the conviction, petitioner was represented by Laura R. Johnson of The Legal Aid Society and co-counsel Lara M. Shalov and Anne S. Raish of Paul, Weiss, Rifkind, Wharton & Garrison LLP. Petitioner asserted that his trial counsel denied him the effective assistance of counsel for failing to consult or retain a medical expert to investigate the unreliability of the complaining witness's identification testimony, the only evidence against petitioner in the case against him. In support of his § 440.10 motion, petitioner submitted an affidavit from a medical expert who affirmed that the injuries suffered by the complainant, his medical treatment, and the circumstances under which he identified petitioner rendered his identification testimony unreliable. Petitioner also submitted polygraph results from polygraph tests conducted by a qualified polygraph expert that showed that the petitioner and the three alibi witnesses were telling the truth when they testified that the petitioner was with them at the time of the crime.

6

On October 4, 2004, Justice Starkey denied the motion without conducting a hearing. *See* Raish Decl., Ex. G (*People* v. *Bell*, Decision and Order, dated October 4, 2004). Pursuant to New York's statutory procedure as set out in C.P.L. §§ 450.15(1), 460.10(4), petitioner sought permission to appeal this decision to the Appellate Division, Second Department. *See* Raish Decl., Ex. H (Notice of Motion for Leave to Appeal and annexed Affirmation of Anne S. Raish, dated November 3, 2004). On January 12, 2005, the Honorable A. Gail Prudenti, a justice of that court, denied petitioner's request. *See* Raish Decl., Ex. I (*People* v. *Bell*, No. 2004-09580, Decision and Order on Application dated January 12, 2005).

## Questions Presented

Whether petitioner was denied the effective assistance of counsel and his due process right to a fair trial where, in this assault and robbery case, the only evidence against petitioner was weak and unreliable identification testimony, and his trial counsel failed to consult a medical expert, failed to impeach the complaining witness's identification testimony by introducing his prior inconsistent statement concerning the identity of his assailant, failed to object to the introduction of highly prejudicial, non-probative evidence, failed to object to the prosecution's impeachment of petitioner in violation of the court's *Sandoval* ruling, failed to exercise a peremptory strike, and failed to make an adequate motion to dismiss the charge of robbery. (U.S. Const., Amends. VI, XIV).

Whether petitioner was denied his right to due process where insufficient evidence was presented to allow any rational trier of fact to find the essential elements of the charge of robbery beyond a reasonable doubt. (U.S. Const., Amend. XIV).

7

## Statement of Facts

On July 16, 1996, Brentonol Moriah was shot in the leg at close range with a full-length shot gun while he was on his way home from work at approximately 2:30 in the morning. (Tr. at 381, 384.)[2]  Before he was shot, Mr. Moriah stood "face to face" with his assailant for "about five minutes." (Tr. at 419.)  Shortly after the assailant fled, Police Officers Patrick Perente and Salvatore Kopita responded to the scene and found Mr. Moriah lying in the street, having lost a lot of blood. (Tr. at 515, 662.)  Officer Perente asked Mr. Moriah what happened, and Mr. Moriah told him that somebody tried to rob him and shot him in the thigh. (Tr. at 663.)  Mr. Moriah also provided Officer Perente with a description of his assailant.  He told Officer Perente that the individual who shot him was "a male black, wearing a lemon-colored shirt." (*Id.*)  Mr. Moriah, however, did not tell Officer Perente that he knew the individual who shot him (*Id.*), and the police reports from the scene list the assailant's identity as "unknown" and "unidentified." *See* Raish Decl., Ex. J.   Shortly thereafter, an ambulance arrived and Mr. Moriah was taken to Kings County Hospital.

Mr. Moriah testified that he was unconscious in the hospital for 11 days. (Tr. at 438.)   Mr. Moriah did not remember speaking to the police officers who responded to the scene; he did not recall giving a description of his assailant to the police

---

[2]   Numbers in parentheses preceded by "Tr. at" refer to the minutes of the trial held on April 28 through May 7, 1997.  Relevant excerpts of the trial transcript are attached as Exhibit Z to the Raish Decl.  The trial transcript can be submitted in its entirety upon the Court's request.

at the scene; and he did not remember being taken to Kings County Hospital.   (*Id.*)
Mr. Moriah only remembers waking up in the hospital after 11 days.   (*Id.*)

During the time that Mr. Moriah was unconscious, Detective Robert
Figueroa, who was assigned as the investigator to the case, attempted on several
occasions to meet with Mr. Moriah at the hospital. (Tr. at 281-87.) He first attempted to
speak with Mr. Moriah on July 16, 1996 but was told that Mr. Moriah was "heavily
sedated, in critical condition and not conscious." (Tr. at 283.) He was similarly told the
next day that he could not speak to Mr. Moriah because Mr. Moriah was "unconscious."
(Tr. at 285.) Twice a week thereafter, Detective Figueroa attempted to meet with
Mr. Moriah at the Kings County Hospital but was told that he was "sedated and still
unconscious and still in the intensive care unit." (Tr. at 287.)

Detective Figueroa was finally able to speak with Mr. Moriah at Kings
County Hospital on July 28, 1996, which was, according to trial testimony, the day after
Mr. Moriah regained consciousness. (Tr. at 287, 440.) On that day, for the first time,
Mr. Moriah identified his assailant as Derrick Bell, his former neighbor with whom he
had shared a kitchen and bathroom for almost a year. (Hrg. at 7; Tr. at 440.)[3]

---

[3]   Numbers in parentheses preceded by "Hrg. at" refer to the minutes of the pre-trial
hearings held on March 17, 19, and 24, 1997. Relevant excerpts of the hearings are
attached as Exhibit Y to the Raish Decl.

Derrick Bell was arrested on August 14, 1996 at his place of work. (Tr. at 772.) At the time he was arrested, he was working as a residential therapist at a home for mentally retarded adults. (Tr. at 771.) Mr. Bell had no criminal record.

Mr. Bell was charged with (i) two counts of robbery in the first degree for forcibly stealing a wallet from Brentonol Moriah and, in the course or commission of the robbery, causing serious physical injury to Mr. Moriah and/or displaying a handgun; (ii) assault in the first degree for intending to cause, and causing, serious physical injury to Mr. Moriah; (iii) assault in the second degree for causing physical injury to Mr. Moriah during the course of commission of a felony; and (iv) grand larceny in the fourth degree for stealing Mr. Moriah's property.  (Indictment No. 10851/96.)  Mr. Bell consistently has maintained his innocence of these crimes. After trial, Mr. Bell took a polygraph test with a qualified polygrapher that indicated that he was telling the truth when he said that he did not shoot Mr. Moriah or attempt to rob Mr. Moriah.  *See* Raish Decl., Ex. K ¶¶ 5, 7.

## Mr. Moriah's Grand Jury Testimony

On August 19, 1996, Assistant District Attorney Julie Mendik videotaped her examination of Brentonol Moriah in his room at King's County Hospital. (GJ. at 4.)[4] She presented the videotaped testimony of Mr. Moriah to the Grand Jury panel on August 20, 1996. (GJ. at 1.)  Ms. Mendik questioned the complainant about his injuries, and he

testified that as of August 19, 1996, almost a month after the crime occurred, he

continued to take pain killers every four hours and he experienced memory lapses.

> ADA MENDIK: Have you – do you have any pain in the
> upper portion of your leg?
>
> MR. MORIAH: I have pain all the time. I have to use pain
> killers every four hours.
>
> ADA MENDIK:     And do you suffer any dizziness or
> memory lapses?
>
> MR. MORIAH: Dizziness and memory lapses.  (GJ. at 9.)

## PRE-TRIAL HEARINGS

On March 17, 19 and 24, 1996, hearings were held pursuant to *Dunaway*

v. *New York*, 442 U.S. 200 (1979), *United States* v. *Wade*, 388 U.S. 218 (1967), and

*People* v. *Rodriguez*, 79 N.Y.2d 445 (1992).   Detective Figueroa testified about his

unsuccessful efforts to speak to Mr. Moriah on July 16, 1996 and the several days

thereafter.  (Hrg. at 38.)  The testimony proceeded as follows:

> ADA RENDELMAN: Between the 16th and 28th, why is it
> that you did not speak to the victim in this case?
>
> DET. FIGUEROA: He was still unconscious.
>
> ADA RENDELMAN: And who informed you he was
> unconscious?
>
> DET. FIGUEROA: Any time I would call the hospital, and
> sometimes speak to a doctor, if available, or a head nurse.
> (Hrg. at 38.)

---

[4]   The transcript of Mr. Moriah's videotaped grand jury testimony is attached as
Exhibit X to the Raish Decl.

11

Mr. Moriah testified at the pre-trial hearing on March 24, 1996. He

testified that he did not remember speaking to the police officers on the night he was shot

and that he was unconscious after the surgery. (Hrg. at 68, 69.)

> ADA RENDELMAN: Do you remember speaking to any police officers the night that you got shot?
>
> MR. MORIAH: I cannot remember.
>
> ADA RENDELMAN: Do you remember how you got to the hospital?
>
> MR. MORIAH: No.
>
> ADA RENDELMAN: Do you remember speaking to a Detective Figueroa?
>
> MR. MORIAH: Yes.
>
> ADA RENDELMAN: Do you remember when you spoke to Detective Figueroa?
>
> MR. MORIAH: After surgery.
>
> ADA RENDELMAN: When was that?
>
> MR. MORIAH: I cannot remember.
>
> ADA RENDELMAN: Do you remember which day you had your surgery?
>
> MR. MORIAH: No, I cannot remember.
>
> ADA RENDELMAN: And do you remember how long after your surgery you spoke to Detective Figueroa? Was it right after?
>
> MR. MORIAH: I know he came and wanted to talk to me, but I was unconscious. (Hrg. at 69.)

12

### The Sandoval Hearing

On September 26, 1996, defense counsel moved for a hearing pursuant to *People* v. *Sandoval*, 34 N.Y.2d 371 (1974), because Mr. Bell wished to testify on his own behalf at trial. On consent of the People, a *Sandoval* hearing was held on April 24, 1997.

At the hearing, the prosecutor stated that there was "just one issue in terms of the Sandoval." (Tr. at 2.) She argued that there was a 1990 incident, in which "the defendant had plead to a violation, disorderly conduct." (*Id.*) Defense counsel responded that he believed that the violation took place when Mr. Bell was a juvenile and that the records of that case were sealed. (Tr. at 3-4) The trial court ruled that the prosecutor could cross-examine Mr. Bell about the "conviction"[5] and a limited inquiry into the events that gave rise to the charge. (Tr. at 6.) The court then asked the prosecutor if there were any other issues, and she replied that there were not any other issues relating to *Sandoval*. (Tr. at 7.)

### Jury Selection

On the first round of jury selection, sixteen panel members were seated in the jury box. (Tr. at 20-21.) After the *voir dire* and a lunch recess, the court began hearing challenges to the prospective jurors. Four jurors were excused for cause and eight were excused on peremptory challenges, four by the prosecution and four by the

---

[5]   As noted on page 25 n.7, a disorderly conduct violation is not a crime.   P.L. § 10.00(6).

13

defense. (Tr. at 52-55.) The four remaining jurors were sworn in by the clerk of the court.

A second panel of sixteen prospective jurors was then seated. (Tr. at 56-57.) Of these sixteen, six were excused for cause. The judge then heard peremptory challenges as to prospective jurors numbers one through fourteen. The prosecution and the defense each exercised peremptory challenges as to two jurors, though the judge refused to allow one of the defendant's challenges on the basis of reverse *Batson*. The judge then heard peremptory challenges as to prospective jurors numbers fifteen and sixteen. The prosecution exercised a peremptory challenge as to one prospective juror while the defense exercised no peremptory challenges. The defense attorney, Mr. Kaplan, then immediately realized he had made a clerical mistake and asked to exercise a peremptory challenge as to juror number eleven. The judge refused. The colloquy went as follows:

> MR. KAPLAN: No peremptories[.]
>
> THE COURT: All right, call them in please, 1, 8, 11, 12, 14 and 16 are selected.
>
> MR. KAPLAN: Judge, one moment. Hold it. My mistake, because we changed juror number 11 so many times, I had to use the reverse side of my page and I forgot about Ms. Larsen, who's juror number 11, and I'[d] like to exer[cise] a peremptory on her.
>
> THE COURT: I think it's too late for that.
>
> MR. KAPLAN: I'm saying I [made] a mistake. I should have the benefit of this mistake over here and I'll explain why. I'm using a peremptory on Ms. Larsen.

14

THE COURT: Ms. Rendelman.

ADA RENDELMAN: I'm sorry.

THE COURT: What's the prosecution's position?

ADA RENDELMAN: I'm going to object. We've already made a decision up to 1 to 14. It's complete.

MR. KAPLAN:    Judge, there were two different individuals seated in number 11. I'm explaining to you a clerical error on my part, that I used the reverse side of the sheet that I was writing down the pedigree and I forgot about it. . . .

THE COURT: All right. Call them in, and Ms. Larsen will be included. The attorneys will have an opportunity to produce their case law and if the law requires it, she'll be excused. (Tr. at 105-07.)

The remaining jurors, including Ms. Larsen, were sworn into the panel and

the court was adjourned for the day.

The following Monday, outside the presence of the sworn and prospective

jurors, the court heard argument on the legal issue of whether defense counsel should

have been able to exercise his peremptory challenge as to juror number eleven. Defense

counsel argued that C.P.L. § 270.15 described the procedure for exercising peremptory

challenges but it did not describe this particular situation. (Tr. at 113-14.) He stated that

he "couldn't find any type of case law regarding this issue." (Tr. at 114.) The prosecutor

argued that the People would be prejudiced because there was a juror that she wanted to

remove but she could not because of C.P.L.§ 270.15 and "now defense counsel is

returning again to already chosen jurors, and the People were forced to decide on those

last two jurors based on the defense counsel keeping that one juror." (Tr. at 115-16.)

15

The court found that, "in the exercise of the Court's discretion, the application [by counsel to exercise a peremptory challenge as to this juror] is denied." (Tr. at 119.)

## THE TRIAL

### The Prosecution's Witnesses

The prosecution called a number of witnesses, including Mr. Moriah, a detective, a police officer, a landlord, a witness to the sound of the gunshot, and one of the doctors who treated the complainant. Of these six witnesses, only Mr. Moriah could provide testimony about the identity of the assailant, the central issue in the case. Mr. Moriah testified that in the early morning hours of July 16, 1996, as he crossed the street and was walking between two parked cars, he felt something heavy on his back and was told to hand over his money. (Tr. at 369, 379.) Mr. Moriah testified that he recognized the voice of the person who asked him for his money as Mr. Bell, who used to live in Mr. Moriah's building. (Tr. at 370.) Mr. Moriah testified that he had lived on the same floor as Mr. Bell and shared a kitchen and bathroom with him for a number of months. (Tr. at 371-73, 375.) They sometimes spoke to each other in passing. (Tr. at 407-08.) Mr. Moriah testified that he never had any arguments or problems with Mr. Bell during the time that they lived together. (Tr. at 408-09.)

Mr. Moriah testified that he told the assailant that he did not have any money and asked him not to shoot. He placed the contents of his pockets – which consisted only of a small black address book – on the hood of an adjacent car. (Tr. at

16

379, 416.) He turned around and faced his assailant. He testified that the assailant was pointing a gun at his leg. He testified that he recognized his assailant as Mr. Bell. (Tr. at 380.) Mr. Moriah also testified that he faced Mr. Bell for "about five minutes." (Tr. at 419.) Mr. Moriah testified that a car light then turned on them and the "next thing [he] kn[ew] [he] was on the road," the gun having discharged. (Tr. at 383.) The gun somehow fell and the assailant pushed Mr. Moriah aside so that he could pick up the gun. (Tr. at 384) According to Mr. Moriah, he then passed out and did not regain consciousness until eleven days later. (Tr. at 384-85, 437-38, 464.)

On cross-examination, Mr. Moriah admitted that he did not identify Mr. Bell as his assailant until eleven days after the incident. (Tr. at 445.) Mr. Moriah also testified that he did not remember speaking to the police at any time on the night of the incident. (Tr. at 438.) Right after the crime occurred, however, Mr. Moriah had told the police that a black male wearing a lemon-yellow shirt had shot him and that the person had run east. (Hrg. at 35; Tr. at 670.) Right after the crime occurred, Mr. Moriah did not identify Mr. Bell as his assailant. The police reports from the scene describe Mr. Moriah's assailant as "unknown" and "unidentified." *See* Raish Decl., Ex. J.

Despite these inconsistencies, Mr. Kaplan never introduced into evidence the police report memorializing Mr. Moriah's statements to the police at the scene of the crime. Mr. Moriah's testimony provided a sufficient foundation for the introduction of the reports which should have been admitted as prior inconsistent statements. Yet, Mr. Kaplan failed to recognize this and failed to introduce the reports which would have cast serious doubt on the credibility of Mr. Moriah's belated identification of Mr. Bell.

17

Mr. Moriah did not testify that he saw his assailant take his only belonging – the black address book – from the hood of the car. Because there was no evidence that it was apparent that Mr. Moriah's address book contained money, it is clear that the assailant had no interest in taking the address book. No other witness at trial testified that Mr. Moriah's assailant took Mr. Moriah's property from the hood of the car.

Dr. Robert Brewer testified on behalf of the prosecution regarding the nature of Mr. Moriah's wounds. (Tr. at 534.) Dr. Brewer testified that he was working in the emergency room on the night that Mr. Moriah was brought to the hospital. He testified that Mr. Moriah's wound was in his left thigh and was consistent with Mr. Moriah having been shot with a shotgun at close range. (Tr. at 537.) The wound kept Mr. Moriah in the hospital for about two months. (Tr. at 541.) Trial counsel did not ask Dr. Brewer what drugs Mr. Moriah was given to keep him sedated and free of pain or what effects those drugs or his injuries might have on his ability to think clearly.

Detective Robert Figueroa also testified on behalf of the prosecution. (Tr. at 280.) He testified that he interviewed Mr. Moriah at the hospital on July 28, 1997. (Tr. at 287.) He testified that he had been unable to interview Mr. Moriah any earlier because Mr. Moriah had been unconscious from the time of the incident through July 28. During the interview, Mr. Moriah told Detective Figueroa that Mr. Bell, his former neighbor, was his assailant. (Tr. at 307.)

18

Consistent with his testimony, Detective Figueroa completed a *Complaint Follow-Up Informational* on July 16, 1996 after attempting to speak with Mr. Moriah at the hospital:

> On 06-16-96, at approx. 1530 hrs, the assigned is present at King's County Hospital, Surgical ICU Section 22. Dr. Chui, Chief Surgeon, informed the assigned that the C/W is still listed as critical and is heavily sedated. Dr. Chui stated the C/W has not regained consciousness. *See* Raish Decl., Ex. J.

On cross-examination, Mr. Kaplan attempted to ask Detective Figueroa about certain statements made by Mr. Moriah at the time of the shooting that had been memorialized in a police complaint report. The court sustained the prosecutor's objections to Mr. Kaplan's line of questioning about the police report. The court stated: "Sustained. Not this witness, Mr. Kaplan. . . . Discontinue this line of questioning. You will have an opportunity with an appropriate witness." (Tr. at 294-95.) At an earlier *Dunaway-Wade* hearing, Detective Figueroa had testified that Mr. Moriah had given a description of his assailant to the police right after the incident, before he was taken to the hospital. (Hrg. at 35.) Mr. Moriah had told the police that his assailant was a black male wearing a lemon-yellow shirt. Further, Mr. Moriah did not identify Mr. Bell as his assailant and the police reports list the assailant's identity as "unknown" and "unidentified." (Hrg. at 37); *See* Raish Decl., Ex. J.

Mr. Moriah's landlord, Richard Edmonds, also testified on behalf of the prosecution. Mr. Edmonds testified at length about non-probative and irrelevant landlord-tenant problems he had with Mr. Bell. Mr. Edmonds' testimony was not only

19

highly prejudicial and non-probative but it also related to events occurring about the time
Mr. Bell moved out of Mr. Edmonds' apartment building, long before the crime occurred.
Mr. Edmonds stated that he rented a room to Mr. Bell in his house in February 1995 after
a request from his sister and niece. (Tr. at 211.) Mr. Bell was to pay his rent on a weekly
basis, which he did for the first few weeks. Mr. Edmonds testified that after the first few
weeks, however, Mr. Bell stopped paying his rent in full and on time. (Tr. at 212.)
Mr. Edmonds testified that Mr. Bell paid him a lump sum in August 1995 and did not pay
anything again until January 1996. (Tr. at 213-14.) Mr. Edmonds stated that Mr. Bell
had tried to pay him more money in February but that Mr. Edmonds had refused the rent
and instead asked Mr. Bell to look for a new place to live. (Tr. at 214.) Mr. Edmonds
testified that he did not want Mr. Bell living in his building any more because Mr. Bell
had friends going back and forth all day and Mr. Bell was not paying his rent on time.
(Tr. at 214.)

        Mr. Edmonds continued to testify about his own steadily worsening
relationship with Mr. Bell. He emphasized and reemphasized that Mr. Bell stayed in the
room without paying rent. Mr. Edmonds testified that when he repeatedly asked Mr. Bell
to leave, Mr. Bell would say that he was leaving, but then would simply stay.
Mr. Edmonds testified that he "thought [Mr. Bell] was playing games." (Tr. at 216.)
After a few weeks, Mr. Edmonds changed the lock on Mr. Bell's door so that Mr. Bell
would be forced to leave. After he changed the lock, however, "Mr. Bell came in . . . and
he asked me to open that lock. He seemed upset." (Tr. at 217.) Mr. Edmonds unlocked
the door for Mr. Bell. Mr. Edmonds then testified that a couple of weeks passed and

20

Mr. Edmonds again put a new lock on the door. Mr. Edmonds stated that instead of asking him to unlock the door, this time Mr. Bell just broke the lock open. (Tr. at 219.) Mr. Edmonds testified that Mr. Bell "seemed pretty angry with me . . . he seemed angry and annoyed. It was like I was inconveniencing him and somewhat harassing him, which I don't think I was." (Tr. at 219.)

When Mr. Edmonds confronted Mr. Bell, Mr. Bell told him that he would move by the following week. (Tr. at 219-20.) Mr. Edmonds testified that Mr. Bell did not move the following week. Because Mr. Bell refused to move, Mr. Edmonds changed one of the locks on the front door to the building. Once again, Mr. Bell came home and asked Mr. Edmonds to let him inside, which Mr. Edmonds did. Mr. Edmonds testified that "Mr. Bell seemed angry also at that time. He didn't say much." (Tr. at 220.) About a week later, Mr. Bell still had not moved. Sometime later, Mr. Edmonds came home one night and found the lock on the front door broken. Mr. Edmonds changed the lock on the front door about two to three weeks later. One night, after he had changed the lock this time, Mr. Bell arrived at the apartment with the police. (Tr. at 222.) The police asked Mr. Edmonds to let Mr. Bell inside to retrieve his belongings. Mr. Edmonds testified that "Mr. Bell was very angry." (Tr. at 223.)

Mr. Edmonds testified that, after the incident with the police, Mr. Bell stayed in the room for a few more weeks. Sometime in June, Mr. Bell came to Mr. Edmonds and "pretend[ed] [to] give[ him] the keys" to the apartment. (Tr. at 225.) After giving Mr. Edmonds the keys, Mr. Edmonds said that Mr. Bell asked him who had moved his belongings out of the room and placed them on the sidewalk outside. (Tr. at

21

225.) Mr. Edmonds testified that he did not put Mr. Bell's belongings outside and that he did not know who had moved them. Once again, Mr. Edmonds testified that "Mr. Bell was very angry at [him.]" (Tr. at 226.) After this, Mr. Edmonds did not see Mr. Bell again, though Mr. Edmonds testified that he sometimes heard Mr. Bell's voice upstairs.

In this extremely lengthy testimony, Mr. Edmonds *never* provided *any* testimony relevant to the question of whether or not Mr. Bell had shot Mr. Moriah or had taken his address book. Mr. Edmonds never testified about Mr. Moriah's relationship with Mr. Bell. He never saw them argue or even interact. He had not seen any of the events in question. He merely testified that both Mr. Bell and Mr. Moriah lived in his building – uncontested facts elicited from both Mr. Moriah and Mr. Bell. (Tr. at 208, 364, 770.) Mr. Edmonds' lengthy and extremely unflattering testimony about Mr. Bell's "angry" and unlawful behavior is not relevant to any aspect of this case.

Despite the irrelevance and prejudicial nature of Mr. Edmonds' testimony, Mr. Kaplan never once objected or sought to exclude such testimony. Other than a few hearsay objections and objections to form, Mr. Kaplan never objected to the admission of the testimony on grounds of irrelevancy or prejudice. His failure to object while the testimony went on at length and in great detail was a serious dereliction of his duty to provide meaningful representation and severely tainted his client's credibility in the eyes of the jurors.

Martin Payne, the only other "witness" to the crime, also testified on behalf of the prosecution. Mr. Payne testified that, while he was in his apartment after

22

work in the early hours of July 16, 1996, he heard someone screaming "no" several times, and then he heard a gunshot. (Tr. at 259.) After hearing the gunshot, Mr. Payne dropped to the floor, crawled over to his window, and looked outside. He could not see anything, however, because it was dark and the leaves of the trees were blocking the street. (Tr. at 260.) Thus, Mr. Payne could not describe Mr. Moriah's assailant. None of the other witnesses at trial were witnesses to the crime.

### The Defense's Witnesses

The defense presented three alibi witnesses – Frederica Sayles, Efani Catlin and David Woodson – each of whom testified that they were with Mr. Bell on the night of July 15-16, 1996. David Woodson testified that he met up with Mr. Bell at the train station at about 12:30 a.m., after Mr. Bell got off from work. (Tr. at 675.) All three witnesses testified that Mr. Bell and Mr. Woodson then met up with Ms. Sayles and Ms. Catlin and went to Mr. Woodson's house, where they played cards. Mr. Bell and Ms. Sayles left at around 5 a.m. for Mr. Bell's apartment. The three alibi witnesses were employed full-time or were in school. None of them had ever been convicted of a crime. (Tr. 560, 612, 673.)

The defense then called Police Officer Patrick Perente to the stand. (Tr. at 661.) Officer Perente testified that he arrived at the scene of the incident shortly after Mr. Moriah was shot. Officer Perente testified that he spoke to Mr. Moriah and that Mr. Moriah gave him a description of his assailant. Specifically, Officer Perente testified that Mr. Moriah told him that his assailant was a black male wearing a lemon-colored

23

shirt. (Tr. at 663.) Officer Perente also testified that Mr. Moriah did not tell him that he knew his assailant. (Tr. at 663.) Finally, Officer Perente testified that Mr. Moriah was going in and out of consciousness. (Tr. at 669.)

The defense attorney then attempted to introduce the police record memorializing this conversation into evidence. (Tr. at 664.) The prosecutor objected and the defense attorney withdrew his application. (Tr. at 665.) The defense attorney then attempted to elicit from Officer Perente that the report identified the assailant as unknown. (Tr. at 666.) The prosecutor objected to this line of questioning. (Tr. at 667.) Instead of putting forth the well-accepted legal arguments for the admission of the police records, Mr. Kaplan withdrew his question and stated that he had no further questions. Similarly, on redirect, Mr. Kaplan failed to introduce the police report into evidence and failed to elicit from Officer Perente that the report identified the assailant as unknown. (Tr. at 670.)

After the testimony from Ms. Sayles, Ms. Catlin, Mr. Woodson and Officer Perente, Mr. Bell took the stand. He testified that, after he left work on the night of July 15-16, he met up with Mr. Woodson and then Ms. Sayles and Ms. Catlin. They played cards at Mr. Woodson's house. At around 5 in the morning, Mr. Bell and Ms. Sayles went back to Mr. Bell's house. (Tr. at 813-14.) Mr. Bell also testified that he

24

has never owned a shotgun,[6] and that he did not shoot Mr. Moriah.  (Tr. at 779-80.)
Mr. Bell has no prior criminal record.[7]

On cross-examination, the prosecutor extensively questioned Mr. Bell on
non-probative, highly prejudicial matters: his rental situation and his relationship with
Mr. Edmonds. The prosecutor repeatedly asked Mr. Bell if he paid his rent on time.  (Tr.
at 792-94.)   She also asked him why he moved out of his apartment, whether
Mr. Edmonds asked him to move out, and how he felt when Mr. Edmonds changed the
lock on the door of his room.  (Tr. at 793-98.)  Further, she asked Mr. Bell whether he
"confronted" the woman who had helped him get the room in Mr. Edmond's house and
whether he was "mad" at her because she removed some of his belongings from his room
and placed them outside the house.  (Tr. at 798-800.)  Mr. Kaplan never objected to the
prosecutor's line of questioning into these highly prejudicial, non-probative matters.

As explained above, Mr. Kaplan failed to consult or retain an expert
witness to testify regarding the crucial issue in the case -- whether Mr. Moriah's
identification of Mr. Bell was reliable given that Mr. Moriah had suffered severe trauma,

---

[6]   None of the evidence presented at trial suggested that the gun used to shoot
Mr. Moriah belonged to Mr. Bell or ever was handled by Mr. Bell.

[7]   On cross-examination, the prosecutor asked Mr. Bell whether he had any prior
convictions.  (Tr. at 784.)  He replied that he did not.  The prosecution then tried to
suggest that Mr. Bell pled guilty to a violation for disorderly conduct in 1990.
Mr. Bell recalled that the case had been dismissed.  Since the case was sealed, there
was no definitive resolution of this issue.  (Tr. at 2-7.)  In any event, a disorderly
conduct violation is not a crime.  P.L. § 10.00(6).

25

showed signs of memory loss and was unconscious for a prolonged period of time before he made such identification.

Mr. Kaplan's failure to do so cannot be attributed to any strategic decision. In a January 28, 2004 telephone conversation with undersigned counsel, trial counsel admitted that he never even considered consulting an expert. He also admitted that he had no medical or psychological training or background which would have enabled him to present those critical factors to the jury. Mr. Kaplan also refused to submit an affirmation in connection with the motion to set aside the judgment of conviction.

The prosecutor then presented a rebuttal witness, Detective Kathy Latawiec, who had interviewed Efani Catlin and Frederica Sayles prior to trial. (Tr. at 843.) Detective Latawiec testified that Ms. Catlin said she was not sure whether the day in question was a Monday or Tuesday. (Tr. at 848.) She also testified as to what Ms. Catlin and Ms. Sayles told her regarding what each of them had been wearing on the night in question. (Tr. at 850, 854-55.)

## THE CHARGE CONFERENCE AND MOTION TO DISMISS

After the prosecution rested, the trial judge asked defense counsel whether he had any motions. Mr. Kaplan made a vague, oral motion to dismiss. (Tr. at 554-56.)

> MR. KAPLAN: Yes, your Honor. At this point defense moves for a trial order of dismissal for two reasons: Based on the fact the People have not presented a prima facia [sic] case, but more specifically, the chain of custody issue regarding the – that wooden handle where the People have not established the chain from Officer Kopita to the officer who tested the gun. Officer Kopita specifically stated he

26

does not know who got the gun over there and who tested the gun, so therefore I believe there is a break in the chain of custody.

THE COURT: It's only a gun, but isn't it —

Mr. KAPLAN: Gun but wooden handle.

THE COURT: Ms. Rendelman?

MS. RENDELMAN: Well, in terms of the insufficiency of prima facia [sic] evidence, I will rely on the record....

THE COURT: The evidence presents sufficient evidence to make out a prima facia [sic] case as to the charges in the view of the Court. The motions are denied. Defense has an exception.

After the defense rested, the court conducted a charge conference. The

trial court again inquired whether the defense had any motions. (Tr. at 875)

COURT: You have motions, Mr. Kaplan?

MR. KAPLAN: Yes. At this point, the defense moves for a motion of dismissal based on the fact the People have not proven their case beyond a reasonable doubt.

COURT: Ms. Rendelman

MS. RENDELMAN: People rely on the record.

COURT: Prosecution has agreed to the withdrawal, at least from the jury, of dismissal of that robbery charge relating to the hand gun grand larceny charge and the misdemeanor weapons charge. Yes?

MS. RENDELMAN: Yes.

COURT: Motions are denied. Defense has an exception.

27

The trial court submitted to the jury the charges of robbery in the first

degree, assault in the first degree and assault in the second degree. With respect to the

charge of robbery, the court instructed the jury as follows:

> That brings us to the charges in the indictment, the first of
> which is robbery in the first degree. That count charges in
> relevant part that the defendant on or about July 16, 1996 in
> Kings County forcibly stole certain property, namely an
> amount of US currency, a wallet and identification from
> Mr. Moriah. And in the course of the commission of the
> crime and in immediate flight therefrom, the defendant
> caused serious physical injury to Brentonol Moriah who
> was not a participant in the crime.
>
> The crime as defined may be broken down into four
> elements, each of which the prosecution must prove beyond
> a reasonable doubt along with the accuracy of the
> identification of the defendant. The crime is defined in the
> Penal Law as follows:
>
> A person is guilty of robbery in the first degree when he
> forcibly steals property and when, in the course of the
> commission of the crime, he causes serious physical injury
> to a person who is not a participant in the crime...The first
> of those elements requires proof that on or about July 16,
> 1996 in Kings County, the defendant stole property from
> Mr. Moriah a quantity of US currency, a wallet and
> identification.
>
> A person steals property when, with intent to deprive
> another of property or to appropriate it to himself, he
> wrongfully takes, obtains or withholds such property from
> an owner thereof; he takes property means to exercise
> control over it permanently or for some extended period or
> under such circumstances as to require the major portion of
> its economic value or benefit....(Tr. at 969-71)

## THE VERDICT AND SENTENCE

The jury convicted petitioner of first-degree robbery and second-degree

assault and acquitted him of assault in the first degree. (Tr. at 1011.) On May 27, 1997,

the court sentenced Mr. Bell to concurrent sentences of twelve-and-a-half to twenty-five

years on the robbery count and three-and-a-half to seven years on the assault count, the

maximum penalty for each count.  (Tr. at Sentencing, 8.)

## THE DIRECT APPEAL

Petitioner filed his direct appeal on April 12, 2002. *See* Raish Decl.,

Ex. A. The brief contained five issues: (1) that petitioner was entitled to a new trial

because highly prejudicial, non-probative evidence portraying him as a liar and a criminal

and creating a mini-trial on petitioner's behavior as a tenant was improperly introduced at

trial; (2) that the trial court erred in refusing to allow defense counsel to exercise a

peremptory challenge to a prospective juror even though that juror had not yet been

sworn and even though the prosecution would have suffered no prejudice by the exercise

of that challenge; (3) that there was insufficient evidence to convict Mr. Bell of robbery

even though there was no evidence presented at trial that the assailant had taken anything

from the complainant; (4) that petitioner was denied the effective assistance of counsel

because, by failing to object to the introduction of voluminous amounts of highly

prejudicial, non-probative evidence, failing to introduce a vital piece of exculpatory

evidence admitted into trial, failing to make an adequate motion to dismiss the charge of

robbery and failing to properly exercise a peremptory strike, trial counsel displayed an

ignorance of basic principles of criminal law and severely prejudiced petitioner's case,

and (5) petitioner's sentence to the maximum allowed under the law was unduly harsh

and excessive given that petitioner had no prior criminal history, no history of prior

29

violence or weapons use and he was gainfully employed at the time of his arrest. The ineffective assistance of counsel claim was limited to facts appearing on the trial record.

In support of his ineffective assistance claim, petitioner cited *Strickland* v. *Washington*, 466 U.S. 668 (1984), and the Sixth and Fourteenth Amendments of the United States Constitution as well as other federal cases and state law precedent.

The prosecution's brief was filed on June 17, 2002. *See* Raish Decl., Ex. L. In its discussion of the ineffective assistance of counsel claim, the prosecution argued, in part, that trial counsel rendered effective assistance because he, *inter alia*, obtained pre-trial hearings, delivered an opening statement, cross-examined prosecution witnesses, and commented on the evidence in summation.

Petitioner submitted a reply brief in July 2002, asserting, in part, that counsel's failure to object to the introduction of highly prejudicial and non-probative evidence along with his other errors had the cumulative effect of depriving petitioner of his right to the effective assistance of counsel. *See* Raish Decl., Ex. M.

By decision and order entered October 7, 2002, the Appellate Division affirmed petitioner's conviction and sentence. *See* Raish Decl., Ex. B. It found that the evidence was legally sufficient to establish the petitioner's guilt beyond a reasonable doubt. With respect to the ineffective assistance of counsel claim, it found, "[a]fter review of the record in its entirety, and without giving undue significance to retrospective analysis, we are satisfied that the defendant received the effective assistance of counsel." The court also found that the sentence imposed was not excessive and that the petitioner's

30

remaining contentions were without merit. *Bell*, 298 A.D.2d at 398, 751 N.Y.S. 2d at 401.

In letters dated November 6, 2002 and November 25, 2002, petitioner sought leave to appeal, emphasizing in the letter the denial of the federal constitutional right to the effective assistance of counsel and raising the insufficiency of evidence claim. *See* Raish Decl., Ex. N. Leave to appeal to the New York Court of Appeals was denied on December 11, 2002. *See* Raish Decl., Ex. C (*People* v. *Bell*, 99 N.Y.2d 555 (2002)).

## THE C.P.L. § 440.10 MOTION TO VACATE THE JUDGMENT

On February 13, 2004, petitioner filed his C.P.L. § 440.10 motion alleging ineffective assistance of trial counsel. *See* Raish Decl., Ex. F. Appellate counsel's affirmation in support of the motion reviewed the trial evidence and outlined the results of the post-conviction investigation. The affirmation stated that trial counsel admitted in a post-conviction telephone conversation with undersigned counsel that he had not consulted a medical expert regarding the effects on memory and perception of severe blood loss, narcotic drugs, and a prolonged period of sedation. Trial counsel admitted that he had not even considered consulting such an expert nor did he have the experience or training necessary to present such evidence to the jury.

The complaining witness's medical records were lost by the District Attorney's Office. *See* Raish Decl., Ex. O (Certificate from the Office of the District Attorney, Kings County, certifying that the case file relating to *People* v. *Bell* could not be located). Following counsel's inability to obtain the medical records of Mr. Moriah,

31

counsel consulted Dr. Brewer, the attending physician who performed surgery on Mr. Moriah on the night the crime occurred.  According to Dr. Brewer, Mr. Moriah was most likely given amnestic and anxiolytic drugs such as Atavin and Versed as well as opiate analgesic drugs such as morphine and Fentanyl to keep him heavily sedated during his stay in the intensive care unit.  *See* Raish Decl., Ex. P (Affidavit of Dr. Robert J. Brewer, dated January 30, 2004).

Counsel also submitted an affidavit from a board-certified neuropsychologist, Dr. Elkhonon Goldberg.  *See* Raish Decl., Ex. Q (Affidavit of Dr. Elkhonon Golding, dated February 12, 2004).  Dr. Goldberg is a Diplomate of the American Board of Professional Psychology in Clinical Neuropsychology.  He is a clinical professor of the Department of Neurology at the New York University School of Medicine, and a lecturer at the Department of Psychiatry at Columbia University.  *Id.* at 1.  Dr. Goldberg concluded that, to a reasonable degree of scientific certainty, Mr. Moriah's identification of Mr. Bell when he was interviewed by the police at the hospital on July 28, 1996 and his subsequent identifications of Mr. Bell were not reliable for a number of reasons.  First, as a result of brain dysfunction due to significant blood loss, Mr. Moriah likely suffered from a kind of memory impairment called retrograde amnesia.  Such impairment affected his ability to recall information acquired before the onset of brain dysfunction, including the identity of his assailant.  Dr. Goldberg concluded that Mr. Moriah's description of an unknown assailant to the police right after the incident – and his failure to identify Mr. Bell at that time – is more reliable than his

32

subsequent identification of Mr. Bell as his assailant when he was interviewed by the police when he regained consciousness over ten days later. *Id.* ¶¶ 5-6.

Second, according to Dr. Goldberg, the prolonged administration of anxiolytic and amnestic medications (like the medications that Dr. Brewer believes were administered to Mr. Moriah) is a possible source of memory degradation, further contributing to Mr. Moriah's retrograde amnesia. While Dr. Goldberg does not know for certain that the drug effects contributed to Mr. Moriah's retrograde amnesia, this possibility is sufficiently great to cast additional reasonable doubt on the accuracy of his recollections. *Id.* ¶ 7.

Third, Mr. Goldberg concluded that because Detective Figueroa met with Mr. Moriah shortly after Mr. Moriah awoke from his over ten-day period of unconsciousness, Mr. Moriah's alertness at the time he spoke to Detective Figueroa was uncertain, casting doubt on the reliability of his statements made at that time. *Id.* ¶ 8.

Finally, Dr. Goldberg noted that it is well-established that false memories, once formed, are very persistent and in fact frequently override true memories. As such, he concludes that Mr. Moriah's later identifications of Mr. Bell as his assailant are also unreliable. *Id.* ¶ 9.

Mr. Bell and his three alibi witnesses, Ms. Sayles, Ms. Catlin and Mr. Woodson, have all taken and passed polygraph examinations performed by a qualified polygrapher. *See* Raish Decl., Exs. K, R, S, T. Mr. Bell took a polygraph examination on March 20, 2003. Mr. Bell responded "no" to the question "did you shoot

33

Mr. Moriah?" during the polygraph exam. He also responded "no" to the question "did you try to rob Mr. Moriah?" The test results indicate that Mr. Bell was telling the truth in his responses.

Mr. Woodson, Ms. Catlin and Ms. Sayles took polygraph examinations on July 16, 2003, December 17, 2003 and January 15, 2004, respectively. Mr. Woodson, Ms. Catlin and Ms. Sayles each responded "yes" to the question "on July 16, 1996 at about 2:00 a.m., was Derrick Bell with you?" They also responded "yes" to the question "on July 16, 1996, was Derrick with you from midnight till about 4:00 a.m.?" The polygraph tests indicated that all three of these alibi witnesses were telling the truth in their responses.

In his memorandum of law in support of the C.P.L. § 440.10 motion, petitioner asserted that he was denied the effective assistance of counsel guaranteed by the United States and New York Constitutions. Citing counsel's admission that he had neglected to consult with a medical expert, petitioner argued that counsel failed to conduct the requisite, adequate pre-trial investigation. Because of his unreasonable lack of preparation, counsel's conduct, including his failure to call a medical expert for the defense, could not be deemed strategic. Citing the affidavit of Dr. Goldberg, petitioner asserted that there was at least a reasonable probability that trial counsel's unprofessional conduct affected the outcome of his trial. Counsel's grossly inadequate trial preparation and failure to consult with a medical expert rendered him unable to challenge the only piece of evidence in this weak, single witness case. Petitioner also argued that counsel's numerous other errors together with his failure to consult a medical expert had the

34

cumulative effect of depriving him of his constitutional right to the effective assistance of counsel.

The prosecution filed an opposition to the § 440 motion on March 31, 2004. *See* Raish Decl., Ex. U. It asserted that trial counsel's failure to call a medical expert was not unreasonable because it was not required by the prevailing professional standards at the time of the trial and the jury was aptly equipped to evaluate the eyewitness identification testimony without an expert. The prosecution also argued that trial counsel rendered effective assistance because he reasonably conducted certain other tasks on behalf of petitioner. The prosecution also asserted that the ineffective assistance claims, other than the claim that trial counsel unreasonably failed to call an expert, were procedurally barred because they were determined on the merits in petitioner's direct appeal.

Petitioner submitted a reply memorandum of law on May 3, 2004. *See* Raish Decl., Ex. V. Petitioner argued that even though trial counsel may have conducted certain tasks in a reasonable manner, trial counsel's single error of failing to call a medical expert was fatal to the petitioner's defense. Petitioner further argued that, contrary to the prosecution's assertion, medical testimony was necessary to enable the jury to evaluate the effect of physical trauma, blood loss, and narcotics on the ability of the complaining witness to recall the events that were the subject of his testimony. Petitioner also argued that the issues raised in support of his ineffective assistance claim that were decided on appeal were not procedurally barred because they supported his

35

claim of cumulative error which could not have been determined on appeal due to facts appearing outside of the record.

The trial judge, Hon. James A. Starkey, did not hear argument on the motion and, in a decision and order dated October 4, 2004, summarily denied the motion in all respects. Justice Starkey found that all but one of petitioner's ineffective assistance of counsel claims were previously raised on direct appeal and were thus procedurally barred. *See* Raish Decl., Ex. G.

With respect to the claim that trial counsel rendered ineffective assistance by failing to call an expert witness, Justice Starkey found that the issue could have been raised on direct appeal. The judge further observed that even if the merits were reached on the claim that trial counsel failed to call an expert witness and thereby rendered ineffective assistance, "the result would be the same." Justice Starkey continued:

> The psychologist's conclusion was not supported by an examination, testing or observation of the complainant. Further, the premises relied upon by him are fraught with hedge words and the only firm conclusion – based on the failure of the complainant to recall talking to the police officer just before complainant lost consciousness – was retrograde amnesia as to that conversation. The expert could not say more than that the retrograde amnesia 'may well have affected Mr. Moriah's memory of the assault itself' and nowhere does he suggest any reason why, if one had amnesia as to the identity of an assailant, he would create and rely upon a false memory of the culprit.

Citing *Strickland* v. *Washington*, 466 U.S. 668 (1984), Justice Starkey found that trial counsel did not fail to provide meaningful representation.

36

By notice of motion dated November 3, 2004, petitioner sought permission from the Appellate Division, Second Department, to appeal the denial of his motion. *See* Raish Decl., Ex. H. He argued that, contrary to the motion court's determination, petitioner's ineffective assistance of counsel claim that was based on trial counsel's failure to consult an expert witness concerning the unreliability of the complaining witness's identification of him as the assailant could not have been raised on direct appeal because it required the development of factual matters beyond the scope of the record on appeal. Evidence concerning the availability and substance of expert medical testimony relating to the reliability of the identification testimony was not present in the record on appeal. Additionally, evidence necessary to establish the reasons for trial counsel's failure to consult an expert witness was similarly not present in the record on appeal.

The trial court also incorrectly applied the procedural requirements of C.P.L. § 440.10(2)(a) in refusing to consider the other grounds supporting petitioner's claim of cumulative ineffective assistance because they were previously raised on direct appeal. Because insufficient facts existed in the record on direct appeal to support defendant's claim of cumulative error, the grounds supporting claims that were decided on direct appeal were not barred and should have been considered by the motion court.

The motion court also erred in finding that the medical expert's conclusions were not sufficiently strong to support a finding that trial counsel rendered ineffective assistance by failing to call an expert witness. The trial court faulted the expert's conclusions because the expert did not examine, test or observe the complainant.

37

However, had trial counsel consulted a medical expert during pre-trial proceedings or in the course of trial, such an expert would likely have been able to examine the complainant. Moreover, the expert would have had access to the complainant's medical records which have since been lost by the district attorney and hindered a comprehensive examination of the complainant's medical condition. The trial court also erred in its conclusion that at the time of trial, expert witness testimony at issue here would not have been admissible in this case. At the time of trial, in 1997, it was well-settled that medical expertise is beyond the ken of an average juror and would have been admitted.

The prosecution opposed the application for the reasons stated in its submissions to the motion court. *See* Raish Decl., Ex. W.  On January 12, 2005, an associate justice of the Appellate Division summarily denied petitioner permission to appeal the denial of his C.P.L. § 440.10 motion. *See* Raish Decl., Ex. I.

## Argument

### The Antiterrorism and Effective Death Penalty Act of 1996

The Antiterrorism and Effective Death Penalty Act of 1996, (hereinafter "AEDPA,") codified at 28 U.S.C. § 2254(d), provides in part that:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim --
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an
unreasonable determination of the facts in light of the
evidence presented in the state court proceeding.

By its terms, the statute calls for deferential treatment only when the

petitioner's federal claim was "adjudicated on the merits" by the state court. If a state

court did not adjudicate the claim "on the merits," federal courts apply the pre-AEDPA

standards, and review *de novo* the state court disposition of the petitioner's constitutional

claims. *Eze* v. *Senkowski*, 321 F.3d 110, 121 (2d Cir. 2003); *Aparicio* v. *Artuz*, 269 F.3d

78, 93 (2d Cir. 2001).

A state court renders an adjudication on the merits when it disposes of the

claim on the merits and reduces its disposition to judgment, *Sellan* v. *Kuhlman*, 261 F.3d

303, 312 (2d Cir. 2001). A state court determination constitutes an adjudication on the

merits even if it does not explicitly refer to the federal basis of the claim. *Eze*, 321 F.3d

at 121.

AEDPA further requires that, in evaluating a petition, a habeas court

employ "clearly established Federal law" as determined by the Supreme Court. In

ineffective counsel cases, the standard enunciated in *Strickland*, 466 U.S. at 668,

constitutes such clearly established law. *Wiggins* v. *Smith*, 539 U.S. 510, 521 (2003);

*Williams* v. *Taylor*, 529 U.S. 362, 391 (2000).

Writing for the Court in Part II of *Williams* v. *Taylor*, Justice O'Connor

defined "contrary to" as "diametrically different," "opposite in character or nature" or

"mutually opposed." *Taylor*, 529 U.S. at 405. Under that definition, "a run-of-the-mill

39

state-court decision applying the correct legal rule from [Supreme Court] cases would not fit comfortably within §2254(d)(1)'s 'contrary to' clause." *Id.* at 406. On the other hand, if a state court "applies a rule that contradicts the governing" Supreme Court law, then, manifestly, its decision is "contrary to" established precedent. *Id.* at 405. The rule that emerged from *Taylor* empowers "a federal habeas court [to] issue the writ under the 'contrary to' clause [of 2254(d)(1)] if the state court applies a rule different from the governing law set forth in [the Supreme Court's] cases, or if it decides a case differently than [the Supreme Court has] done on a set of materially indistinguishable facts." *Bell* v. *Cone*, 535 U.S. 685, 694 (2002); *see also Lockyer* v. *Andrade*, 538 U.S. 63, 73 (2003); *Francis S.* v. *Stone*, 221 F.3d 100, 109 (2d Cir. 2000) ("[S]tate court use of an incorrect legal standard can result in a decision 'contrary to' established Supreme Court law").

When a state court "correctly identifies the governing legal principle," "but unreasonably applies it to the facts of a particular case," a habeas petitioner is entitled to relief under §2254(d)(1)'s "unreasonable application" clause. *Bell*, 535 U.S. at 694; *Taylor*, 529 U.S. at 407-08. An "unreasonable application" is not merely an "incorrect" or an "erroneous" one, *Bell*, 535 U.S. at 694; *Taylor*, 529 U.S. at 411, even when a habeas court has a "firm conviction" that "clear error" has occurred. *Lockyer*, 538 U.S. at 75. On the other hand, to establish his right to relief under this clause, a habeas petitioner need not show that a state court has applied Supreme Court law "in a manner that reasonable jurists would all agree is unreasonable." *Taylor*, 529 U.S. at 409. Rather, a habeas court must determine whether the state decision under review applied

Supreme Court precedent in an "objectively unreasonable" manner. *Lockyer*, 538 U.S. at 75-76; *Bell*, 535 U.S. at 694; *Taylor*, 529 U.S. at 409.

While this formulation of the rule is "virtually tautological," *Francis S.*, 221 F.3d at 111, the Second Circuit has indicated that habeas review must focus on whether the "state court decision reveals an increment of wrongness beyond error." *Id.* The Circuit "caution[ed] however, that the increment need not be great; otherwise habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence." *Id.* at 111 (citation omitted).

**I.   Petitioner Was Denied the Effective Assistance of Counsel and His Right to Due Process Because His Trial Counsel Unreasonably Failed to Refute the Only Piece of Evidence Against Petitioner in the Case and Demonstrated a Lack of Knowledge and Understanding of Basic Principles of Criminal Law**

A defendant's Sixth Amendment right to effective assistance of counsel is violated when "counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686. To prevail on an ineffectiveness claim, a defendant must show that his attorney's performance fell "below an objective standard of reasonableness," and there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.   A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. Thus, when a defendant challenges a conviction, "the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695.

41

A defense attorney must conduct an adequate pre-trial inquiry as the failure to do so "puts at risk both the defendant's right to an ample opportunity to meet the case of the prosecution and the reliability of the adversarial testing process." *Kimmelman* v. *Morrison*, 477 U.S. 365, 385 (1986) (citations omitted). "Pretrial investigation, principally because it provides a basis upon which most of the defense case must rest is, perhaps, the most critical stage of a lawyer's preparation." *House* v. *Balkcom*, 725 F.2d 608, 618 (11th Cir.), *cert. denied*, 469 U.S. 870 (1984); *see also Bryant* v. *Scott*, 28 F.3d 1411, 1415 (5th Cir. 1994) (counsel must, at minimum, "make an independent investigation of the facts and the circumstances in the case"); *Sanders* v. *Ratelle*, 21 F.3d 1446, 1457 (9th Cir. 1994); *United States* v. *Gray*, 878 F.2d 702, 711 (3d Cir. 1989); *Birt* v. *Montgomery*, 709 F.2d 690, 701 (7th Cir. 1983), *cert. denied*, 469 U.S. 874 (1984) (all finding ineffective counsel's failure to undertake adequate investigation).

Courts reviewing ineffective assistance of counsel claims should not second guess counsel's trial tactics and should indulge in the strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *Strickland*, 466 U.S. at 689. The deference courts owe an attorney's trial strategy is not unlimited, however. Instead, any judicial deference bears a direct relationship to the adequacy of the investigations underlying counsel's decisions:

> [S]trategic decisions made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a

42

> duty to make reasonable investigations or to make a
> reasonable decision that makes particular investigations
> unnecessary. In any ineffectiveness case, a particular
> decision not to investigate must be directly assessed for
> reasonableness in all the circumstances, applying a heavy
> measure of deference to counsel's judgments.

*Strickland*, 466 U.S. at 691; *see also Wiggins*, 539 U.S. at 525-29 (counsel's decision to

limit scope of investigation into potential mitigation evidence not entitled to deference as

it was made at an unreasonable stage, rendering a fully informed decision impossible);

*Taylor*, 529 U.S. at 390 (counsels' failure to uncover and present voluminous mitigating

evidence at sentencing could not be justified by their stated decision to focus on

petitioner's cooperation with authorities because counsel had not fulfilled their obligation

to conduct a thorough social history); *Pavel* v. *Hollins*, 261 F.3d 210, 220, 223 (2d Cir.

2001) (failure to call lay and expert witnesses was among grounds for ineffectiveness

finding as counsel's decisions were based on an inadequate investigation); *Holsomback* v.

*White*, 133 F.3d 1382, 1388 (11th Cir. 1998) (having conducted no investigation into the

significance of the lack of medical evidence that the child complainant had been sexually

abused, counsel could not have made an informed decision whether to present medical

testimony); *Williams* v. *Washington*, 59 F.3d 673, 680 (7th Cir. 1995) ("Counsel has a

duty to conduct an independent investigation of his client's case or to articulate a

strategic reason for his failure to do so."); *Gray*, 878 F.2d at 711 ("Ineffectiveness is

generally clear in the context of complete failure to investigate because counsel can

hardly be said to have made a strategic choice against pursuing a certain line of

investigation when s/he has not yet obtained the facts on which such a decision should be

made.").

43

To determine whether counsel exercised reasonable professional judgment, the inquiry is whether the investigation supporting counsel's tactical decision was itself reasonable. *Wiggins*, 539 U.S. at 522. Thus, "in assessing counsel's investigation, [the court] must conduct an objective review of their performance, measured for 'reasonableness under prevailing professional norms,' which includes a context-dependent consideration of the challenged conduct as seen 'from counsel's perspective at the time'" *Id.* (internal citations to *Strickland* omitted). In addition, "a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Id.* at 527.

## A. Trial Counsel Unreasonably Failed to Consult a Medical Expert Concerning the Unreliability of the Complaining Witness's Identification

Recent Second Circuit precedent establishes that the failure to consult an expert in cases where expert evidence would call into question the only evidence against the defendant constitutes ineffective assistance. Where a case "hinges all-but-entirely on whom to believe, an expert's interpretation of relevant physical evidence is the sort of 'neutral disinterested' testimony that may well tip the scales and sway the fact-finder." *Pavel*, 261 F.3d at 224 (defense counsel's failure to retain expert witness, *inter alia*, constituted ineffective assistance where the only witnesses to the crime were the victim and the defendant and there was no substantial circumstantial evidence) (quoting *Williams* v. *Washington*, 59 F.3d at 682); *Lindstadt* v. *Keane*, 239 F.3d 191, 201-02 (2d Cir. 2001) (failure to consult an expert, *inter alia*, constituted ineffective assistance where expert testimony or advice could have challenged the only physical evidence introduced

44

against defendant); *see Eze* v. *Senkowski*, 321 F.3d at 129 ("[T]he decision not to call a witness must be grounded in some strategy that advances the client's interests."); *see also Gersten* v. *Senkowski*, 299 F. Supp. 2d 84, 100 (E.D.N.Y. 2004) (despite complicated medical issues in child sex abuse case, counsel failed to consult expert or otherwise educate himself about physical indicia of sexual abuse; as a result of that failure, he was unable to conduct effective cross-examination of prosecution's expert or to offer defense expert to rebut state's witness's assertions.); *Thomas* v. *Kuhlman*, 255 F. Supp. 2d 99 (E.D.N.Y. 2003) (no strategic rationale excused counsel's failing to undertake an investigation of crime scene or to pay sufficient attention to the discovery materials that were turned over to him).[8]

In *Miller* v. *Senkowski*, 268 F. Supp. 2d 296 (E.D.N.Y. 2003), the defendant was charged with rape and sodomy of a ten-year-old child. *Id.* at 298. At trial, the victim testified that she was sexually assaulted by the defendant on several occasions. *Id.* at 302. The child's pediatrician testified to the results of his medical examination of the victim, and a child psychologist testified to the signs of child sexual abuse syndrome.

---

[8]  *See also Schell* v. *Witek*, 218 F.3d 1017, 1028 (9th Cir. 2000) (in case in which only evidence against defendant was fingerprint "match," counsel's failure to solicit the help of a fingerprint expert could have constituted ineffective assistance of counsel; remanded for hearing to determine if counsel had consulted an expert); *Rogers* v. *Israel*, 746 F.2d 1288, 1294-1295 (7th Cir. 1984) (in murder prosecution in which the effect of a gunshot wound to the decedent's heart was central issue, counsel's failure to ask a qualified medical expert about the matter would have been ineffective; remanded to determine whether counsel had consulted a qualified physician); *United States* v. *Tucker*, 716 F.2d 576, 581 (9th Cir. 1983) (in a case involving conspiracy and income tax fraud, "it should have been obvious to a competent lawyer that the

*Id.* at 304. The pediatrician testified that he observed an injury to the victim's hymen but could not rule out other causes that may have been likely causes of the injury. *Id.* at 312. Although the defendant's trial counsel cross-examined the medical experts presented by the prosecution, he failed to consult a medical expert prior to his cross-examination and failed to retain a competing expert witness to testify at trial. *Id.* at 312. The defendant was convicted of rape and endangering the welfare of a child and was sentenced to 18 to 54 years incarceration. *Id.* at 306.

Subsequent to defendant Miller's unsuccessful appeal, the United States District Court for the Eastern District of New York granted his petition for habeas corpus finding that he was denied effective assistance of counsel based on his trial counsel's cumulative errors, including failure to consult and retain an expert witness. *Id.* at 314-15. The court concluded that a reasonably competent attorney when noting an inconsistency in medical evidence proffered by the prosecution would have "consulted an expert to drive this disparity home." *Id.* at 312 (quoting *Pavel*, 261 F.3d at 224-25); *Eze*, 321 F.3d at 128 (discussing and quoting *Pavel* and noting that consultation with an expert was crucial because "(1) counsel had neither the education nor the experience necessary to evaluate the evidence and 'make for himself a reasonable, informed determination as to whether an expert should be consulted or called to the stand;' and (2) there was an 'obvious, common sense mismatch' between the physical evidence and the allegations

---

assistance of an accountant would be necessary to trace the distribution of the funds alleged to have been illegally spent").

46

such that a 'reasonably professional attorney' would have consulted and been ready to call an expert to address the inconsistencies").

Similarly, in *Thomas* v. *Kuhlman*, 255 F. Supp. 2d at 107, the defendant was convicted of second-degree murder based on testimony from an eyewitness that she observed defendant on the fire escape outside the victim's apartment shortly after the crime occurred and based on evidence that blood was found on defendant's shoes that matched the victim's blood type. *Id*. at 102. After trial, it was established that it would have been impossible for the eyewitness to have seen the defendant from her vantage point as she had testified. *Id*. at 104. Defense counsel could have established that fact at trial, but failed to do so because he failed to investigate (a) the crime scene, (b) the police reports that described the layout of the scene, and (c) the location where the eyewitness had been when she said she saw the defendant. *Id*. at 109.

The district court granted the defendant's petition for habeas corpus finding that, although there was other evidence of his guilt, the eyewitness testimony was "of overwhelming importance for the prosecution's case," and defense counsel's failure to challenge it constituted ineffective assistance. *Id*. at 109. Moreover, the district court stated that although defense counsel's assistance was "in general, highly professional and efficacious," the single error of neglecting to investigate the crime scene "rendered his performance constitutionally ineffective." *Id*. at 101.

The instant case presents an even more compelling basis for relief than the facts presented in *Thomas* because, here, the complaining witness's identification of

47

Mr. Bell was the *only* evidence connecting Mr. Bell to the crimes charged. This case was un-winnable unless defense counsel could explain how someone who had lived with Mr. Bell for more than a year could misidentify him. Indeed, the government concedes the singular importance of the identification evidence. As the government argued in it opposition to petitioners' § 440 motion:

> [T]he People's evidence was strong…Moriah knew [the] defendant. They had lived on the same floor of a rooming house for approximately one year, sharing a bathroom and kitchen. Moriah had no motive to falsely accuse [the] defendant. (Raish Decl., Ex. U at 22.)

The *only* evidence the government relies on to argue that its case was strong – and the *only* evidence it could rely on – was Mr. Moriah's identification of Mr. Bell. Trial counsel's failure to investigate and undermine the reliability of the only evidence against Mr. Bell, therefore, destroyed the only viable defense available to Mr. Bell.

Like *Miller*, this case boiled down to a credibility/reliability contest and was marked by a significant inconsistency in the prosecution's case. The only direct evidence against Mr. Bell was the belated identification testimony of Mr. Moriah. The reliability of that identification was undermined by a major inconsistency. When police officers responded to the incident, Mr. Moriah was conscious, able to communicate, and provided the officers with a specific description of his assailant. (Tr. at 663.) Mr. Moriah did not at that time, however, identify his assailant as his former neighbor, Mr. Bell. The police reports specifically list the assailant's identity as "unknown" and "unidentified." *See* Raish Decl., Ex. J. Further, Mr. Moriah only identified Mr. Bell as his assailant shortly after he emerged from a drug-induced state of unconsciousness over

48

ten days later. (Hrg. at 7; Tr. at 440.). Mr. Moriah had no recollection of speaking to the police at the crime scene (Hrg. at 68, Tr. at 438.), and, as of four weeks after the incident, he continued to experience memory lapses. (GJ. at 9.) In this circumstance, a reasonably competent attorney would have consulted a medical expert to explain the inconsistencies in the evidence. Moreover, given the specialized nature of the scientific issues involved, it would have been clear to competent counsel that consultation with an expert was required. *Pavel*, 261 F.3d at 224. Mr. Kaplan, by his own admission, has no background or training in neuropsychology that would have enabled him to reasonably forego the assistance of an expert.

No strategic or otherwise legitimate explanation exists for trial counsel's failure to consult an expert witness concerning the effect of the witness's trauma and prolonged period of unconsciousness on the reliability of the ensuing identification. *Eze*, 321 F.3d at 112 ("if certain omissions cannot be explained convincingly as resulting from a sound trial strategy, but instead arose from oversight, carelessness, ineptitude, or laziness, we would find the quality of representation sufficiently deficient to grant the writ."). Mr. Moriah failed to identify Mr. Bell at the scene of the crime when he provided the police with a description of his assailant and, as both sides agree, Mr. Moriah had no motive to falsely accuse Mr. Bell. These facts would have led a reasonably competent attorney to question whether the severe trauma and lengthy drug-induced state of unconsciousness could have had an impact on the reliability of Mr. Moriah's identification. Mr. Bell's trial counsel, by his own admission, did not even consider consulting an expert. Nor did he have the medical training or background to

enable him to understand the effect of the severe trauma, blood loss and prolonged unconsciousness of Mr. Moriah or to present such evidence to the jury. *Id.* Accordingly, it cannot be said that trial counsel's failure to consult an expert was based on a strategic decision made after thorough consideration and, therefore, his failure to consult an expert constitutes ineffective assistance of counsel. *See Thomas*, 255 F. Supp. 2d at 107.

As evidenced by Dr. Goldberg's affidavit, Mr. Moriah's identification of Mr. Bell when he was interviewed by the police at the hospital on July 28, 1996 and his subsequent identifications of Mr. Bell were not reliable for a number of reasons. *See* Raish Decl., Ex. Q (Affidavit of Dr. Elkhonon Goldberg ¶ 4.) First, as a result of brain dysfunction due to significant blood loss, Mr. Moriah likely suffered from a kind of memory impairment called retrograde amnesia. Such impairment affected his ability to recall information acquired before the onset of brain dysfunction, including the identity of his assailant. Dr. Goldberg concluded that Mr. Moriah's description of an unknown assailant to the police right after the incident – and his failure to identify Mr. Bell at that time – is more reliable than his subsequent identification of Mr. Bell as his assailant when he was interviewed by the police when he regained consciousness over ten days later. *Id.* (Goldberg Aff. ¶¶ 5-6.)

Second, according to Dr. Goldberg, the prolonged administration of anxiolytic and amnestic medications is a possible source of memory degradation, further contributing to Mr. Moriah's retrograde amnesia. While Dr. Goldberg does not know for certain that the drug effects contributed to Mr. Moriah's retrograde amnesia, he finds this

50

possibility is sufficiently great to cast additional reasonable doubt on the accuracy of his recollections. *Id.* (Goldberg Aff. ¶ 7.)

Third, Dr. Goldberg concluded that because Detective Figueroa met with Mr. Moriah shortly after Mr. Moriah awoke from his over ten-day period of unconsciousness, Mr. Moriah's alertness at the time he spoke to Detective Figueroa was uncertain and likely to have been less than completely normal, casting doubt on the reliability of his statements made at that time. *Id.* (Goldberg Aff. ¶ 8.)

Finally, Dr. Goldberg noted that it is well-established that false memories, once formed, are very persistent and in fact frequently override true memories. Accordingly, Dr. Goldberg concluded that Mr. Moriah's later identifications of Mr. Bell as his assailant are likewise unreliable. *Id.* (Goldberg Aff. ¶ 9.) Such a conclusion is commonsensical and is reflected in the United States Supreme Court's identification jurisprudence, which provides that witnesses are apt to retain their initial misidentification thereby reducing the trustworthiness of subsequent identifications. *Simmons* v. *United States,* 390 U.S. 377, 383-84 (1968); *see e.g., United States* v. *Wade,* 388 U.S. 218, 229 (1967) ("[I]t is a matter of common experience that, once a witness has picked out the accused at the line-up, he is not likely to go back on his word later on. . . ."); *see also Manson* v. *Brathwaite,* 432 U.S. 98, 130 (1977) (Marshall and Brennan, JJ., dissenting) (even if a witness is "unsure initially about his identification . . . it is impossible to imagine his responding negatively [at trial] to such questions as 'is there any doubt in your mind whatsoever' that the identification was correct").

51

Had trial counsel performed a competent investigation of Mr. Moriah's belated identification of Mr. Bell, he would have discovered a strong scientific basis to challenge the reliability of Mr. Moriah's identification. Had trial counsel offered Dr. Goldberg's testimony at trial, it would have been admitted. Expert testimony is generally admissible where it would assist a lay jury in reaching a verdict and is generally accepted by the relevant scientific community. *People* v. *Lee*, 96 N.Y.2d 157, 162 (2001). Medical information is universally considered to be beyond the ken of the average juror. *See People* v. *Crawford*, 183 A.D.2d 775, 776 (2d Dep't 1992) (results of blood test conducted by doctor properly admitted into evidence because such analysis is typically beyond the ken of the typical juror); *Robillard* v. *Robbins*, 168 A.D.2d 803, 904 (3d Dep't 1990) (holding that "opinion of an expert on the ultimate issue of fact is admissible when it concerns a matter requiring professional or skilled knowledge such as medical conditions").

Dr. Goldberg's testimony would have assisted the jury in making its determination in this case because it goes directly to the reliability of the only evidence connecting petitioner to the crimes. Further, his affidavit is based on factors that have been widely observed, studied and analyzed in his field and his testimony is based on studies and analyses that are generally accepted in the field of neuropsychology. Testimony concerning the effect of unconsciousness and injury on memory perception is not "within the ken of the typical juror." *Lee*, 96 N.Y.2d at 162. Typical jurors would not be able to draw conclusions from evidence concerning the effect of blood loss and the administration of certain medications on Mr. Moriah's memory perception based on their

52

day-to-day experiences, their common observation, or their knowledge.  The jurors, therefore, would have benefited from the specialized knowledge of an expert such as Dr. Goldberg.

Defense counsel's failure to investigate the reliability of Mr. Moriah's identification with a scientific expert was not the product of a strategic decision. Mr. Kaplan, by his own admission, failed to even consider consulting an expert. *Maddox* v. *Lord*, 818 F.2d 1058, 1061-62 (2d Cir. 1987) (where counsel fails to investigate and pursue thoroughly defendant's strongest defense to the charges, counsel's decision cannot be said to be sound trial strategy).

A defendant is prejudiced by ineffective assistance where there is a reasonable probability that but for counsel's errors, the result of the proceeding would have been different. *Aguirre* v. *Alameida*, No. 03-56795, 2005 WL 176243 (9th Cir. Jan. 27, 2005). In *Aguirre*, petitioner was convicted of attempted second degree robbery with a knife. *Id.* at *2. Before trial, petitioner's counsel was aware that petitioner had been the victim of two violent crimes, but failed to investigate a post-traumatic stress disorder defense. *Id.* The Court found that counsel rendered ineffective assistance by failing to secure an expert to examine petitioner for post-traumatic stress disorder and to explain to the jury how such a disorder may have affected petitioner when he brandished a knife in front of the complainant. *Id.* at *1. The Court reasoned that

> "There is a reasonable probability that," but for Aguirre's
> counsel's failure to investigate the PTSD defense, 'the
> result  of  the  proceeding...would  have  been
> different...Psychiatric and medical testimony could have

53

> enabled trial counsel to identify appellant's PTSD as an
> explanation for why Aguirre perceived Parra as a threat and
> believed he needed to defend himself.   Without such
> explanation, the jury was left with no explanation apart
> from counsel's bare assertion that Parra may have been
> lying about the entire incident.

*Id.*

Mr. Bell was seriously prejudiced by his counsel's failure to call an expert

witness.   Without expert testimony, the jury was left with no explanation as to why

Mr. Moriah would misidentify petitioner as his assailant.   The expert testimony was

crucial to the defense of Mr. Bell's case because it would have called into question the

reliability of Mr. Moriah's identification of Mr. Bell -- *the only evidence* connecting

Mr. Bell to the shooting of Mr. Moriah.   Mr. Moriah's identification of Mr. Bell seemed

almost unassailable because Mr. Moriah and Mr. Bell had been neighbors.   Yet this

expert scientific evidence would have called into question the reliability of that

identification.   Moreover, there was no physical or other evidence connecting Mr. Bell to

this crime.   Had trial counsel consulted and presented testimony from an expert witness,

there is a reasonable probability that the outcome of the proceeding against Mr. Bell

would have been different. *See Strickland*, 466 U.S. at 688.

Moreover, the prejudice to Mr. Bell is exacerbated here because Mr. Bell

consistently has maintained his innocence of the crimes for which he was convicted.   He

has taken and passed a polygraph test with a qualified polygrapher that indicated he was

telling the truth when he responded that he had not attempted to rob, and had not shot,

Mr. Moriah.[9]  *See* Raish Decl., Ex. K.  Similarly, all three alibi witnesses[10] have taken

and passed polygraph tests with a qualified polygrapher indicating that they were telling

the truth when they stated that Mr. Bell was with them at the time that Mr. Moriah was

robbed and shot.[11]  *See* Raish Decl., Exs. R to T.  At the time of his arrest Mr. Bell had no

criminal history and was employed full-time as a residential therapist at a home for

mentally retarded adults in Queens.  Had trial counsel consulted an expert witness and

taken polygraph tests of Mr. Bell and the alibi witnesses, he could have approached the

district attorney with this evidence before the trial began.[12]  Given the evidence here, had

---

[9]  Specifically, during the polygraph examination, Mr. Bell responded "no" to the question "did you shoot Mr. Moriah?"  He also responded "no" to the question "did you try to rob Mr. Moriah?"  The test results indicate that Mr. Bell was telling the truth in his responses.

[10]  The three alibi witnesses, David Woodson, Efani Catlin (now Efani Catlin-Woodson) and Frederica Sayles, were employed full-time or were in school.  None of them had ever been convicted of a crime.  (Tr. at 560, 612, 673.)  Mr. Woodson, like Mr. Bell, worked as a residential therapist in the field of mental retardation.  (Tr. at 673.)  Ms. Catlin worked for a temp agency doing data entry and as a receptionist, a job she had held for five years.  (Tr. at 612.)  Ms. Sayles was in school at the Parent Institute and worked as an intern at Bridge Street Head Start, her son's school.  (Tr. at 560.)

[11]  Mr. Woodson, Ms. Catlin and Ms. Sayles each responded "yes" to the question "on July 16, 1996 at about 2:00 a.m., was Derrick Bell with you?"  They also responded "yes" to the question "on July 16, 1996, was Derrick with you from midnight till about 4:00 a.m.?"  The polygraph tests indicated that all three witnesses were telling the truth in their responses.

[12]  The court should have considered the polygraph evidence.  New York courts have considered polygraph results where the evidence against the defendant was weak or unreliable.  *People* v. *Miller*, No. 2003-213, 2004 WL 615136, *4 (N.Y. Co. Ct. Mar. 18, 2004) (dismissing indictment based, in part, on results of polygraph test of defendant in which he denied committing the crime charged); *People* v. *Daniels*, 102 Misc. 2d 540, 547 (Sup. Ct. 1979) (admitting polygraph evidence at criminal trial and finding that "where the possibility that a conviction may stand or fall on a single eyewitness identification which is proverbially untrustworthy and less reliable than

trial counsel been effective, he would have had substantial evidence to present to the District Attorney before this case even reached the trial stage. And, even if the District Attorney did not agree to dismiss the charges against Mr. Bell, there would have been a much greater likelihood of an acquittal of the charges against Mr. Bell at trial if the expert's testimony had been presented.

Trial counsel's failure to consult an expert witness, especially taken together with his other failures, deprived Mr. Bell of his right to due process and the effective assistance of counsel. *See Lindstadt*, 239 F.3d at 199; *Miller*, 268 F. Supp. 2d at 315.

### B. Trial Counsel Failed to Introduce into Evidence Statements in a Police Report Contradicting the Complaining Witness's Identification Testimony

An attorney's failing to obtain or review discoverable materials or to employ those materials adequately in impeaching prosecution witnesses is also unreasonable. *See e.g., Williams* v. *Washington,* 59 F.3d at 680 (7th Cir. 1995)

---

the polygraph, then fairness dictates that it may be received in evidence if the appropriate criterion is met") (internal citations omitted).

Prosecutors regularly employ polygraph tests as an investigative tool to assess the weight of the evidence in a case. *E.g., People* v. *Martin*, 235 A.D.2d 551 (2d Dep't 1997) (defendant to undergo polygraph test as part of plea agreement and charges to be dismissed if the examination revealed that defendant's denial of his involvement was revealed to be truthful); *see also People* v. *Vinson*, 104 Misc. 2d 664, 668 (Sup. Ct., West. Cty. 1980) (noting the wide use of polygraph examinations by law enforcement personnel and encouraging district attorney's office to use polygraph tests to "screen out those cases for which formal judicial proceedings may prove to be inappropriate").

(counsel's failure to familiarize himself with discovery materials provided by the state was not objectively reasonable and was among grounds for ineffectiveness finding); *Bryant* v. *Scott*, 28 F.3d at 1416-17 (5th Cir. 1994) (failure to employ discovery material as basis for conducting independent investigation); *Henderson* v. *Sargent*, 926 F.2d 706, 712 (8th Cir. 1991), *cert. denied*, 502 U.S. 1050 (1992) (failure to "pursue any of the leads contained in the police file"); *Nixon* v. *Newsome*, 888 F.2d 112, 115, 116 n. 8 (11th Cir. 1989) (failure to follow up cross-examination of witness by confronting her with inconsistent testimony given at codefendant's trial; "it would be inexcusable not to have the . . . transcript at hand, or, if it were at hand, it would be inexcusable to be unfamiliar with its contents"); *Blackburn* v. *Foltz*, 828 F.2d 1177, 1184 (6th Cir. 1987), *cert. denied*, 485 U.S. 970 (1988) (failure to procure impeachment material — "the one obvious and only logical means of diminishing [witness's] identification testimony").

In *Harris* v. *Artuz*, 288 F. Supp. 2d 247, 259 (E.D.N.Y. 2003), *aff'd*, 100 Fed. Appx. 56 (2d Cir. 2004) (summary order), defense counsel was found ineffective for failing to impeach the prosecution's four alleged eyewitnesses to a murder with medical records in his possession. Of the four witnesses, all of whom were friends, one claimed to have been shot in the hand during the incident, an assertion they all echoed at trial. The medical records, however, documented that the injured man had been stabbed in the hand, not shot. Counsel neither referred to the records nor sought to impeach the witnesses with them and failed to argue that the documentary evidence undermined the four friends' collective credibility. Indeed, in summation, counsel conceded that the man had been shot but argued that all four witnesses had misidentified the defendant.

The district court found that counsel's failure to cross examine the

witnesses about the alleged shot to the hand

> cannot reasonably be dismissed as strategic. Simply stated,
> there was no downside to introducing the medical evidence
> for impeachment purposes. Defense counsel's theory of the
> case -- that petitioner was misidentified by the four
> witnesses -- would have been aided rather than impeded by
> the introduction of evidence undermining the veracity of
> the witnesses . . . Because no reasonable trial strategy could
> have been affected adversely by introducing this evidence,
> it seems exceeding unlikely that trial counsel was even
> aware of it. His failure to make use of the medical records
> is otherwise beyond reasonable explanation. Even if it
> could be shown that counsel was aware of the documents,
> "the failure to introduce this evidence, without any
> plausible justification, appears to be a significant
> dereliction by the defense"

*Id.* at 259-60 (internal citation omitted).

In the instant case trial counsel failed to introduce into evidence the police

report that reveals Mr. Moriah's failure to identify Mr. Bell when he spoke to the police

shortly after the incident. The statements in this report should have been introduced into

evidence to impeach Mr. Moriah's testimony on cross-examination. *See, e.g., Blackburn,*

828 F.2d at 1184; *Harris,* 288 F. Supp. 2d at 159-60. Further, the police report itself

should have been admitted to prove that the statements recorded therein were made by

Mr. Moriah and the statements themselves should have been admitted either as non-

hearsay or under the excited utterance exception to the hearsay rule. *See People* v.

*Maisonave,* 140 A.D.2d 545 (2d Dep't 1988) (police report that is not admissible under

business records exception to hearsay rule "is admissible, however, for proof that the

statement was made. . . . The statement itself could then be admitted for its truth and

58

content if it fit under another hearsay exception"); *see also Murray* v. *Donlan*, 77 A.D.2d 337, 345 (2d Dep't 1980) (same).

Defense counsel's failure to use the police report to impeach Mr. Moriah's testimony constituted deficient performance. It is axiomatic that a witness' testimony may be impeached by a prior inconsistent statement as long as an appropriate foundation is laid. *See, e.g., People* v. *Carter*, 227 A.D.2d 661, 663 (3d Dep't 1996) ("If the witness denies that the statement was made or does not remember making it, he or she may be impeached by the testimony of others who heard the statement."); *People* v. *Cruz*, 88 A.D.2d 621 (2d Dep't 1982). A witness' failure to remember is sufficient to establish an appropriate foundation. Defense counsel's ignorance of this fundamental precept of criminal law led to his failure to confront Mr. Moriah with this impeachment evidence. *See, e.g., Nixon* 888 F.2d at 116 n.8. Defense counsel asked Mr. Moriah whether he gave any description of his assailant to the police after he was shot. Mr. Moriah replied "I can't remember." (Tr. at 438.) Defense counsel also asked Mr. Moriah whether he ever told the police that he did not know who did this to him. Mr. Moriah replied, "I didn't talk to no police officer [prior to talking to Detective Figueroa]." (Tr. at 445.) Further, Mr. Moriah testified on direct that he told Detective Figueroa that Mr. Bell was his assailant. (Tr. at 393.) The statements in the police report – that the assailant was a black male wearing a lemon-yellow shirt and was unknown – clearly were inconsistent with this testimony. *See, e.g., People* v. *Sepulveda*, 105 A.D.2d 854, 856-57 (2d Dep't 1985) (error in failing to allow defense counsel to impeach prosecution's main witness with prior inconsistent statements that went to critical issue in case -- whether the

59

defendant was the person who shot the victim). Inexplicably, however, defense counsel failed to confront Mr. Moriah with the description he gave to police officers at the scene of the incident, and failed to question him as to how it was that he had directly faced his assailant for some five minutes and had lived right next to Mr. Bell for a few months – and yet failed to identify him at the time of the incident.

Further, defense counsel had an obligation to introduce the police report into evidence. While defense counsel attempted to introduce the police report into evidence through Officer Perente, he failed to do so. Such a failure reveals his deficient performance and makes clear that it was not a tactical or strategic decision not to introduce such evidence. It was defense counsel's ignorance of the law that led to his inability to have the police report admitted into evidence. Even where a police report contains statements from a declarant not under a duty to make statements to the police, and the report cannot therefore be introduced into evidence because it does not qualify under the business record exception to the hearsay rule, the report is admissible to show that the statement was made. *People* v. *Maisonave*, 140 A.D.2d at 547; *see Murray*, 77 A.D.2d at 345. The hearsay statements in the report can then be admitted as long as they fall into another exception to the hearsay rule. *Id.*

In *People* v. *Selassie*, 140 Misc.2d 616 (Sup. Ct., Bronx Cty. 1988), for example, the court admitted a police report containing a description of the defendant even though the report did not fit under the business record exception to the hearsay rule. In *Selassie*, as here, the defendant sought the introduction of a report that contained "a vital piece of exculpatory evidence – namely, a description of the perpetrator." *Id.* at 617.

60

While the report did not fit under the business record exception to the hearsay rule because the description of the perpetrator was given by the complainant, the court nonetheless held that the report was admissible as a matter of law. The court reasoned that the rationale for the rule against admission of such reports is a concern for a defendant's right to confront the witnesses against him. However, when it is *the defendant* who is seeking to introduce the evidence, such a rationale has no application. The court stated that *"to bar its use by the defendant would defy logic." Id.* at 620 (emphasis added). The court then noted that the hearsay statements within the report could be admitted as long as they fell within another exception to the hearsay rule. *Id.* at 621. The *Selassie* court found that the content of the report was admissible to impeach the complainant's testimony. *Id.* at 621.

Similarly, here, the police report that should have been admitted contained "a vital piece of exculpatory evidence" – namely, a description of the assailant given by Mr. Moriah at the time of the crime and a statement that the assailant was unknown. While the report may not fit under the traditional business report exception to the hearsay rule because the statements in the report were given by Mr. Moriah, the report should have been admitted to show that these statements were made.

Further, the statements themselves are admissible because they are not hearsay. Hearsay is an out-of-court statement offered to prove the truth of the matter asserted therein. *People* v. *Buie*, 86 N.Y.2d 501, 506 (1995). The statements contained in the police report at issue here are not hearsay because they would not have been offered for the truth. Rather, they would have been offered to show that Mr. Moriah did

61

not name Mr. Bell as his assailant when he spoke to the police immediately following the incident and instead gave the police a description of an unnamed person.

In any event, even if the statements are deemed hearsay, they fall within the excited utterance exception to the hearsay rule. A statement is admissible under the excited utterance exception to the hearsay rule where the statement was made "under the immediate and uncontrolled domination of the senses, and during the brief period when considerations of self-interest could not have been fully brought to bear by reasoned reflection." *People* v. *Cotto,* 92 N.Y.2d 68, 78-79 (1998) (citation omitted). Here, the statements were made shortly after the traumatic wound was inflicted on Mr. Moriah and before he was taken away in the ambulance. *See People* v. *Colon,* 187 A.D.2d 445, 445-46 (2d Dep't 1992) (victim's statements in response to police questioning that "'Mandy Colon' from Brooklyn had shot him" were admissible under the excited utterance exception even though they were in response to police questioning because victim – who was lying in the street with gunshot wounds – was still under the stress of the event such that he "lacked the reflective capacity essential for fabrication") (citation omitted). Thus, Mr. Moriah's statements to the police contained in the police report would have been admissible under the excited utterance exception to the hearsay rule. As such, the police report, and the statements contained therein, should have been admitted. Defense counsel provided ineffective assistance in failing to have such evidence admitted.

Defense counsel's failure to introduce this evidence severely prejudiced Mr. Bell's defense. The sole issue in the case was the identity of the assailant. This evidence shows that in the immediate aftermath of the incident, Mr. Moriah failed to

62

identify his assailant as Mr. Bell – even though he had lived next door to Mr. Bell for about a year and even though he had faced his assailant for some five minutes. Rather, Mr. Moriah gave a description of an unnamed man to the police. Given Mr. Moriah's later statement that he knew his assailant, this evidence was absolutely critical – indeed, it could not have been more important to Mr. Bell's defense – as it casts doubt on Mr. Moriah's belated identification of Mr. Bell. Had the jury been presented with this evidence, it would have had a significant impact on the jury's deliberations. As such, defense counsel's failure to introduce this evidence denied Mr. Bell the effective assistance of counsel to which he had a constitutional right. *See Lindstadt* v. *Keane*, 239 F.2d at 201 (2d Cir. 2001) (counsel's assistance ineffective where he failed to cross-examine prosecution's witness in lieu of presenting an expert witness).

### C.  Trial Counsel Failed to Object to the Introduction of Inadmissible, Highly Prejudicial and Non-Probative Evidence

An attorney's failure to object to the introduction of inadmissable, highly prejudicial and non-probative evidence may also constitute ineffective assistance. "Where…petitioner's claim rests in part upon the failure to object to the admission of evidence, it is necessary to determine whether the evidence was so damaging that counsel's failure to object deprived petitioner of the 'reasonably effective assistance to which he is entitled." *Quartararo* v. *Fogg*, 679 F. Supp. 212, 240 (E.D.N.Y. 1988). Not all such failures by trial counsel are sufficiently prejudicial to lead to a finding of ineffective assistance of counsel; "[i]n determining the existence of *vel non* prejudice, the court must consider the totality of the evidence before the judge or jury." *Kimmelman*, 477 U.S. at 381 (quoting *Strickland*, 466 U.S. at 695). A finding of ineffective assistance

63

of counsel does not, however, require that the evidence admitted due to trial counsel's failure be central to the prosecution's case. While the evidence admitted to the counsel's failures to object "may not have been as important as other components of the State's case, it may have tipped the balance." *Kimmelman,* 477 U.S. at 390.

In *Quartararo,* trial counsel was found to have provided ineffective assistance because he failed to object to the prosecution's elicitation of testimony regarding the defendant's parents' opinion of the trustworthiness of his brother's confession. *Quartararo,* 679 F. Supp. at 241. The Court found this failure inexcusable where the opinions were introduced as hearsay and where the parents were not, in any case, competent to opine on the circumstances of the crime to which defendant's brother had confessed. *Id.*

Here, defense counsel failed to recognize that Mr. Edmonds' testimony about Mr. Bell's purportedly bad character acts should not have been introduced into evidence. Such evidence was unduly prejudicial and should have been excluded. *People v. Alvino,* 71 N.Y.2d 233, 241 (1987). In general, evidence of prior uncharged crimes or other immoral acts is not admissible where its purpose is to establish the accused's propensity to engage in criminal or immoral activities. *Id.; People v. Santarelli,* 49 N.Y.2d 241, 247 (1980). Such evidence is excluded as a matter of policy, though it may have some probative value, because it may induce the jury to base a finding of guilt on collateral matters or to convict a defendant because of his past. *Alvino,* 71 N.Y.2d at 241; *Santarelli,* 49 N.Y.2d at 247; *People v. Molineux,* 168 N.Y. 264, 294 (1901). Only where it helps establish some element of the crime, or fits into another recognized exception to

64

the rule, may such evidence be admitted. *Alvino*, 71 N.Y.2d at 241; *Santarelli*, 49 N.Y.2d at 247; *Molineux*, 168 N.Y. at 294. In *Molineux*, the New York Court of Appeals articulated a non-exhaustive list for circumstances under which evidence of uncharged crimes may be relevant: evidence is admissible if it goes to the accused's (i) intent; (ii) motive; (iii) knowledge; (iv) identity; or (v) a common scheme or plan. *Id.* at 294. Even where evidence is admissible under one of these factors, however, the evidence still cannot be admitted unless its probative value exceeds the potential for prejudice to the defendant. *Alvino*, 71 N.Y.2d at 241; *People v. Ventimiglia*, 52 N.Y.2d 350, 359-60 (1981).

Defense counsel did not object to the introduction of this evidence. In fact, it appeared that he did not even know that he could – and must – object to the introduction of this highly prejudicial, non-probative evidence. Failure to make any argument to the trial court to exclude such evidence deprived Mr. Bell of the effective assistance of counsel.

Moreover, defense counsel failed to recognize that the prosecutor's impeachment of Mr. Bell on cross-examination regarding the landlord-tenant relation ship was in violation of the court's *Sandoval* ruling and C.P.L. § 240.43. It was the prosecutor's burden to notify the defendant of prior uncharged bad acts that she wished to use to impeach the defendant. Further, under C.P.L. § 240.43, the prosecutor is required to disclose, at the *Sandoval* hearing, any bad acts that she plans on using to impeach the defendant. "The purpose of a *Sandoval* hearing is to determine the extent to which the defendant, if he testifies, will be subject to impeachment by cross-examination about

prior bad acts." *People* v. *Dokes*, 79 N.Y.2d 656, 660 (1992) (citing *People* v. *Sandoval*, 34 N.Y.2d at 375). While the defendant bears the burden of bringing to the court's attention any prior convictions about which he seeks to preclude cross-examination by the people, it is the people's burden to notify the defendant of any uncharged "criminal, vicious or immoral conduct" that it intends to use at trial for impeachment purposes. *Dokes*, 79 N.Y.2d at 661 n.3; C.P.L. § 240.43. Although the prosecutor did not identify the prior uncharged bad acts, defense counsel failed to object to her improper questioning of Mr. Bell.

By failing to recognize that Mr. Edmonds's prejudicial testimony should have been excluded, and that the improper questioning of Mr. Bell should not have been permitted, defense counsel failed to recognize one of the most important tenets of criminal procedure: that the introduction of prejudicial evidence increases the chances that the jury will convict the defendant not because of the defendant's guilt of the crime charged but because the defendant appears to have a bad or criminal character. *E.g.*, *Santarelli*, 49 N.Y.2d at 247-48; *Sandoval*, 34 N.Y.2d at 376-77.

In *Henry* v. *Scully*, 918 F. Supp. 693 (S.D.N.Y. 1988), the court found that trial counsel had provided ineffective assistance when he failed to object to the introduction of an inadmissible confession by Henry's co-defendant, where the remainder of the prosecution's case depended "almost entirely on the testimony of a single officer whose credibility had to be considered against that of defendant." In this case, where the prosecution's only relevant evidence was the problematic testimony of Mr. Moriah, defense counsel should have strenuously objected to the introduction of non-probative

prejudicial evidence and to the prosecutor's improper cross-examination of Mr. Bell; his failure to do so deprived Mr. Bell of the assistance of a defense counsel who recognized the basic elements of criminal law.

Furthermore, there can be no tactical or strategic explanation for defense counsel's failures, as there clearly would have been no harm in moving to exclude this highly prejudicial evidence or to restrain the prosecutor's cross-examination of Mr. Bell. And, the evidence should have been excluded as a matter of law. *E.g.*, *Santarelli*, 49 N.Y.2d 241; C.P.L. § 240.43. The record makes apparent that defense counsel's inaction was due to ignorance of the basic provisions of the law, not to any tactical or strategic judgment. The only possible conclusion, therefore, is that defense counsel's performance was deficient. *See, e.g. Mason* v. *Scully*, 16 F.3d 38, 42 (noting counsel's duty to protect a defendant from having prejudicial hearsay admitted against him); *Henry*, 918 F. Supp. at 714 (finding ineffective assistance of counsel where "there is no possible strategy which would have justified allying Taylor's confession to be used as evidence against Henry.").

**D.      Trial Counsel Failed to Exercise a Peremptory Strike**

Furthermore, defense counsel, by failing to timely exercise a peremptory strike, denied the defendant his right to be tried by a jury of his choosing. *See, e.g.*, *People* v. *Sims*, 55 A.D.2d 629 (2d Dep't 1976) (finding ineffective assistance of counsel where counsel neglected to timely file a motion to suppress identification testimony, neglected to order minutes of preliminary hearing and neglected to pursue court file where counsel was apparently more concerned with "impending litigation in the Federal

67

courts than in according this defendant the best possible representation which the facts of the case would allow"). Trial counsel admitted that his failure to exercise an intended peremptory strike was due to his own negligence. (Tr. at 106.) As such, there could have been no tactical or strategic reason for defense counsel's failure to exercise the strike in question.

### E. Trial Counsel Failed to Make an Adequate Motion to Dismiss the Charge of Robbery.

As discussed more fully in Point II, *infra*, there was insufficient evidence presented at trial to convict Mr. Bell of robbery in the first degree. At the close of the prosecution's case-in-chief, trial counsel moved to dismiss the case against Mr. Bell for "two reasons": (i) the People's failure to present a prima facie case; and (ii) the absence of a proper chain of custody. Trial counsel did not elaborate his argument that the People had not proven their case beyond a reasonable doubt. (Tr. at 875.) Similarly, at the close of the presentation of evidence trial counsel moved for dismissal simply "based on the fact [that] the People have not proven their case beyond a reasonable doubt." *Id.* Trial Counsel's failure to make a more specific motion prevented the court from understanding the basic failure of the prosecution to present any evidence that Mr. Bell had "wrongful[ly] tak[en], obtain[ed], or withh[eld] any property with the intent to deprive another person of that property." N.Y.P.L. § 150.05 (defining larceny, an element of robbery under N.Y.P.L § 160). Because he failed to raise the specific grounds upon which a dismissal would be justified, trial counsel provided the court with no basis to rule on trial counsel's motion. *See People* v. *Gray*, 86 N.Y.2d 10 (1995) (noting that a defendant must make his or her position known to the court" and "[e]ven where a motion

to dismiss for insufficient evidence was made, the argument must be 'specifically directed' at the alleged error"). It is inexcusable that trial counsel was unaware of this basic principle of criminal law.

F.    **This Court Should Review De Novo the State Motion Court's Disposition of Petitioner's Federal Constitutional Claims**

Where a state court has not adjudicated a habeas corpus petitioner's claim "on the merits," the pre-AEDPA standard of review applies, under which the district court "review[s] *de novo* the state court disposition of the petitioner's federal constitutional claims." *Aparicio*, 269 F.3d at 93 (citing *Washington* v. *Schriver*, 255 F.3d 35, 55 (2d Cir. 2001)); *accord Eze*, 321 F.3d at 121. Because neither the Appellate Division nor the § 440 motion court reached the merits of petitioner's complete ineffective assistance claim, this Court should review that claim *de novo*.

In this case, the Appellate Division did not reach the merits of petitioner's cumulative claim because it did not have before it on the record on direct appeal all of the grounds supporting petitioner's ineffective assistance of counsel claim. Because the Appellate Division did not consider all of the constituent parts of petitioner's cumulative claim, it did not consider and decide petitioner's cumulative ineffective assistance of counsel claim on the merits.

The decision of the trial court on petitioner's C.P.L. § 440 motion also did not dispose of petitioner's cumulative claim on the merits, because, in denying petitioner's motion, the court erroneously concluded that each of petitioner's ineffective assistance of counsel arguments were procedurally barred by C.P.L. § 440.10(2)(a) or (c).

69

Although the motion court had before it the expanded record containing the entirety of the grounds for petitioner's cumulative ineffective assistance of counsel claim, the court declined to adjudicate petitioner's cumulative claim by invoking procedural bars that were inapplicable. *See* Section H, *supra*, pp. 79 to 82.

Additionally, the state motion court failed to adjudicate on the merits petitioner's claim that trial counsel rendered ineffective assistance of counsel by failing to consult, or even to consider consulting, a medical expert because the court erroneously invoked a procedural bar that was inapplicable. *See* Section H, *supra*, pp. 79 to 82. After erroneously invoking the procedural bars, the motion court stated that "the result would be the same if the merits were reached." Such dicta couched in conditional, subjunctive language—even where it appears to touch on the merits of an issue—is not considered "an adjudication on the merits." *See Harris* v. *Reed*, 489 U.S. 255, 264 n.10 (1989); *Garcia* v. *Lewis*, 188 F.3d 71, 77-82 (2d Cir. 1999).

Because the state motion court erroneously declined to adjudicate the ineffective assistance of counsel claim on the merits, both petitioner's (1) discrete claim regarding his counsel's failure to consult a medical expert and (2) cumulative claim that the totality of trial counsel's egregious errors denied him the effective assistance of counsel should be reviewed *de novo*. *Aparicio*, 269 F.3d at 93; *Eze*, 321 F.3d at 121. In any event, the state courts' rejection of petitioner's ineffective assistance of counsel claim was an unreasonable application of *Strickland*.

70

**G.** **The Rejection of Petitioner's Ineffective Assistance Of Counsel Claim by the State Appellate Court and the State Motion Court Was an Unreasonable Application of *Strickland***

The expanded record before the motion court demonstrated beyond question that trial counsel's performance fell below an objective standard of reasonableness and that there is at least a reasonable probability that, but for his cumulative, unprofessional errors, the outcome of the trial would have been different. Any possible ambiguity regarding the adequacy of counsel's pre-trial preparation was dispelled by his post-conviction admissions that he failed to consult with a medical expert and had no excuse for that failing. Given his admission that he had no excuse for failing to undertake even a minimal investigation on a complex subject critical to the only defense available to the petitioner, his conduct warrants no judicial deference. *Wiggins* v. *Smith*, 539 U.S. at 525-29 (rejecting as unreasonable counsels' articulated strategy where strategy was not based on appropriate pre-trial investigation); *Strickland*, 466 U.S. at 691.

This case hinged on the reliability of the complainant's memory and the credibility of Mr. Bell and his three alibi witnesses, each of whom has demonstrated their truthfulness by taking a polygraph exam. Yet, trial counsel failed to take the minimum necessary steps to present to the jury the significant, available evidence that called into question the reliability of the complainant's memory, while at the same time failed to protect his client from the introduction into evidence of inadmissible, highly prejudicial and non-probative evidence which unfairly tainted the jury's perception of Mr. Bell's character and credibility.

71

Despite the fact that the prosecution's only witness identified the petitioner – his former housemate – as his assailant only after emerging from a lengthy period of unconsciousness, trial counsel never introduced complainant's prior inconsistent identification concerning the identity of the assailant to impeach complainant, thus failing to cast reasonable doubt on the only evidence implicating petitioner. Even more seriously deficient, trial counsel failed to consult with a medical expert about the potential effect that Mr. Moriah's loss of blood, prolonged unconsciousness, and medication likely had on his memory. This failing alone would be sufficient to support a finding of ineffective assistance of counsel. *Wiggins*, 539 U.S. at 525-29; *Pavel v. Hollins*, 269 F. 3d at 223. But trial counsel's failures did not end at his failure to attack the only evidence against petitioner.

Not only did trial counsel fail to take the necessary steps to demonstrate to the jury the unreliability of Mr. Moriah's testimony, he also failed to take the necessary steps to protect the credibility of his own client. Trial counsel failed to object to the elicitation by the prosecution of voluminous, irrelevant, non-probative and highly prejudicial testimony from petitioner's former landlord concerning their landlord-tenant disputes. Then, after failing to object to the introduction of such lengthy, prejudicial testimony during the direct examination of petitioner's former landlord, trial counsel failed to object when the prosecution improperly questioned Mr. Bell concerning the same, inadmissible subject matter in clear violation of the court's *Sandoval* ruling.

The prosecution was required to provide advance notice to petitioner of any uncharged "criminal, vicious or immoral conduct" that it intended to use at trial for

72

impeachment purposes. *Dokes*, 79 N.Y.2d at 661 n.3; C.P.L. § 240.43. Although the prosecutor did not provide any notice that she intended to introduce into evidence during her cross-examination of petitioner the prior, uncharged acts concerning petitioner's problems with his landlord, trial counsel stood idly by without objecting to the introduction of such evidence either on the grounds that it was introduced in clear violation of the court's *Sandoval* ruling or on the grounds that it was highly prejudicial and non-probative inadmissible evidence. It is apparent that defense counsel's inaction was due to ignorance of the basic provisions of the law, not to any tactical or strategic judgment. The only possible conclusion, therefore, is that defense counsel's performance was deficient.

Having failed to call into question the reliability of the testimony of the prosecution's only witness, despite ample opportunity to do so, and having failed to object to the prosecution's improper impeachment tactics, trial counsel then failed to make an adequate motion to dismiss the charge of robbery despite the fact that no evidence had been admitted at trial indicating that the assailant exercised dominion or control over any of Mr. Moriah's possessions.

Trial counsel also failed to exercise a peremptory strike to a potential juror and thereby prejudiced petitioner's case because petitioner was not afforded his right to be tried by a jury of his choosing. Although the court afforded trial counsel an opportunity to present a legal argument concerning why his belated peremptory strike should be given effect, trial counsel utterly failed to marshal any legal support for his argument that the peremptory strike should be allowed. Again, it is apparent that such

73

inaction was not due to a thoughtful strategic choice, but was due to trial counsel's failure to do the necessary legal research in order to make a strategic decision.

But for trial counsel's numerous, egregious errors, there is more than a reasonable probability that the outcome of the trial would have been different. This is a case in which the evidence against petitioner was extremely weak. The complainant's identification of petitioner was the *only* evidence connecting Mr. Bell to these crimes. That identification evidence was weak and unreliable for the following several reasons: (1) the complainant said that he knew his assailant as his former neighbor with whom he had shared a kitchen and bath and that he stood face to face with his assailant for a full five minutes during the incident. Yet, *Mr. Moriah failed to identify Mr. Bell as his assailant at the scene of the crime*; (2) the complainant testified that several weeks after the crime occurred he continued to experience memory lapses; (3) the complainant testified that he did not recall talking to the police at the scene of the crime; and (4) the complainant lost over half of his blood as a result of the gun shot, lost consciousness, was deeply sedated on narcotics and amnestic drugs for more than 10 days before regaining consciousness, and identified Mr. Bell as his assailant only after emerging from unconsciousness. Had counsel introduced the significant evidence that cast more than reasonable doubt on the only evidence in this case and had trial counsel not permitted the prosecution to unfairly and improperly attack the character of petitioner, the result of these proceedings would have been different.

Further, the prejudice from trial counsel's failures is exacerbated because Mr. Bell consistently has proclaimed his innocence of these crimes. Mr. Bell has taken

74

and passed a polygraph test that indicates he told the truth when he responded that he had not robbed or shot Mr. Moriah. In addition, all three of Mr. Bell's alibi witnesses have taken and passed polygraph tests that indicate that they told the truth when they said that Mr. Bell was with them at the time Mr. Moriah was shot. At the time of Mr. Bell's arrest, he had no criminal history and was employed full-time as a residential therapist at a home for mentally retarded adults in Queens. Similarly, the three alibi witnesses were employed full-time or were in school. None of them had ever been convicted of a crime.

Given the utterly deficient performance of trial counsel, which lacked any valid strategic basis, and given the prejudice that the deficient performance caused petitioner in this extremely weak case, the motion court's summary rejection of petitioner's claims constituted a significant "increment of incorrectness beyond error." *Francis S.*, 221 F.3d at 111. Because the state motion court's rejection of petitioner's ineffective assistance of counsel claim was an unreasonable application of *Strickland*, this Court should grant the petition.

Moreover, several substantial flaws in the motion court's reasoning demonstrate an unreasonable application of *Strickland*. Justice Starkey determined:

> The psychologist's conclusion was not supported by an examination, testing or observation of the complainant. Further, the premises relied upon by him are fraught with hedge words and the only firm conclusion – based on the failure of the complainant to recall talking to the police officer just before complainant lost consciousness – was retrograde amnesia as to that conversation. The expert could not say more than that the retrograde amnesia "may well have affected Mr. Moriah's memory of the assault itself" and nowhere does he suggest any reason why, if one

75

had amnesia as to the identity of an assailant, he would create and rely upon a false memory of the culprit.

The motion court's statement that the expert's conclusions were not supported by examination was unreasonable. The medical expert determined in his professional opinion that there was a sufficient evidentiary basis on which to establish his conclusions. Accordingly, it was unreasonable for the court – especially without a hearing – to reject the expert's professional conclusion that he had a sufficient evidentiary basis on which to make his findings.

The motion court was also unreasonable in conducting a selective parsing of the expert's words out of context to support its conclusion that his opinion was "fraught with hedge words." In fact, the expert's opinion was firm and conclusive as to the pertinent issues he examined. For example, Dr. Goldberg affirmed, "I conclude, to a reasonable degree of scientific certainty, that Mr. Moriah's identification of Mr. Bell when he was interviewed by the police at the hospital on July 28, 1996 and his subsequent identifications of Mr. Bell were not reliable." *See* Raish Decl., Ex. Q, ¶ 4. Dr. Goldberg also affirmed that, "I have concluded that Mr. Moriah's testimony contains unequivocal evidence that he suffered from retrograde amnesia for the events predating the loss of consciousness." *Id.* at ¶ 6. Dr. Goldberg further affirmed that "retrograde amnesia was likely to impair Mr. Moriah's memories of the assailant's identity." *Id.* Accordingly, contrary to the unreasonable conclusions reached by the motion court, Dr. Goldberg made numerous, specific pronouncements concerning the unreliability of the identification testimony in this case.

The motion court was also unreasonable in concluding that, at the time of trial in 1997, it was not clear that expert evidence such as that provided by Dr. Goldberg was admissible. The cases cited by the motion court, *People* v. *Lee*, 96 N.Y.2d 157 (2001), and *People* v. *Kelley*, 220 A.D.2d 456 (2d Dep't 1995), involved social science evidence that has only recently gained widespread acceptance. The instant case, however, involved expert medical testimony, and such evidence has long been considered admissible as involving matters outside the ken of the typical juror. *See People* v. *Crawford*, 183 A.D.2d 775, 776 (2d Dep't 1992) (results of blood tests conducted by doctor properly admitted into evidence because such analysis is beyond the ken of the typical juror); *Robillard* v. *Robbins*, 168 A.D.2d 803, 804 (3d Dep't 1990) ("opinion of an expert on the ultimate issue of fact is admissible when it concerns a matter requiring professional or skilled knowledge such as medical conditions").

Indeed in situations very similar to that at issue in this case, courts have historically admitted expert testimony regarding the effects of drugs or trauma on mental process. *State* v. *Cronin*, 60 N.Y.2d 430 (1983) (reversing for failure to allow expert witness to testify to defendant's mental state after ingesting a case of beer, several marijuana cigarettes and 5 to 10 Valium tablets); *People* v. *Real*, 137 A.D.2d 416, 416 (1st Dep't 1988) ("Since the key issue for the jury's determination was whether defendant could have formed the required intent for the charged crimes, the court erred in precluding defendant from calling an expert to testify as to the effect of 'angel dust' intoxication on his ability to form such intent.").

In the instant case, the key issue was the reliability of Mr. Moriah's identification testimony.  Mr. Moriah identified Mr. Bell immediately after he emerged from a 11-day period of drug-induced sedation and 11 days after he suffered from severe trauma as a result of a point blank shotgun wound and a significant amount of blood loss. Moreover, when he identified Mr. Bell, he had just waken up from a prolonged period of unconsciousness, and was still under the influence of narcotics and amnestics.  Testimony regarding the effects of severe trauma, blood loss, medication, and prolonged unconsciousness on the memory is beyond the ken of the typical jury.  The typical juror does not have the experience or skills to assess the effect that blood loss or narcotics have on the brain.  Without expert testimony, the jury was unable to draw conclusions from the facts and was left to rely on mere speculation.  Without expert testimony, there was no explanation for how a man who lived with Mr. Bell and had no motive to falsely accuse Mr. Bell of anything could nonetheless mistakenly identify him as his assailant.  The motion court's determination that it is not clear whether Dr. Goldberg's testimony would have been admissible at the time of trial was accordingly unreasonable.

To the extent the motion court made any implicit factual adverse findings, it was unreasonable to make such findings summarily on the papers without a hearing, *see Garcia* v. *Portuondo*, No. 03 Civ. 2458, 2003 WL 22510390 (S.D.N.Y.), *modified on other grounds*, 104 Fed. Appx. 776, 779-80 2004 WL 1612675 (2d Cir. 2004) (summary order), and this Court should issue the writ. 28 U.S.C. § 2254(d)(2).

78

### H.    There Is No Procedural Bar to Habeas Relief

The motion court's determination that petitioner's ineffective assistance of counsel claims were procedurally barred is not an adequate state ground and thus does not bar habeas review of petitioner's claim. It is well-settled that a "procedural bar will be deemed adequate only if it is based on a rule that is firmly established and regularly followed by the state in question." *Cotto* v. *Herbert*, 331 F.3d 217, 239 (2d Cir. 2003) (quoting *Garcia* v. *Lewis*, 188 F.3d 71, 77 (2d Cir. 1999)). Where the rule "is inadequate under this test the rule should not operate to bar federal review." *Id.*

Justice Starkey found that petitioner's claim was procedurally barred by C.P.L. § 440.10(2)(c) because sufficient facts appeared on the record to have put petitioner in a position to adequately have raised his counsel's failure to call an expert on direct appeal, but that petitioner unjustifiably failed to do so. The motion court's reliance on C.P.L. §440.10(2)(c) is not, however, a state ground adequate to bar habeas review of petitioner's claims as it is not invoked in all similar cases. *See Lee* v. *Kemna*, 534 U.S. 362, 387 (2002); *Cotto* 331 F.3d at 239-241 (2d Cir. 2003); *Bonilla* v. *Portuondo*, No. 00 Civ. 2369, 2004 U.S. Dist. LEXIS 2774, at *30 (S.D.N.Y. Feb. 26, 2004) (finding "a review of New York caselaw demonstrates that C.P.L. § 440.10(2)(c) is not regularly followed in the context of ineffective assistance of counsel claims" and determining that application of that procedural rule in the context of ineffective assistance of counsel claim for failing to call a particular witness was not an adequate state ground barring federal habeas review).

Ineffective assistance of counsel claims that require development of the record must be brought by a motion under C.P.L. § 440. *People* v. *Logan*, 2 A.D.3d 1392 (4th Dep't 2003) (ineffective assistance of counsel claim that involves matters outside the record on appeal must be raised by way of motion pursuant to C.P.L. § 440); *People* v. *Reynolds*, 309 A.D.2d 976 (3d Dep't 2003) (same); *People* v. *Donaldson*, 1 A.D.3d 800, 801 (3d Dep't 2003) (ineffective assistance of counsel claims requiring factual development must be addressed in a C.P.L. § 440 motion). New York Courts have also held that a claim challenging counsel's failure to call a witness does not sufficiently appear in the record and thus should not be dismissed if raised for the first time on a § 440.10 motion. *See People* v. *Stewart*, 295 A.D.2d 249, 249-50 (1st Dep't 2002); *People* v. *Fu Chen*, 293 A.D.2d 362, 363 (1st Dep't 2002); *People* v. *Taborn*, 292 A.D.2d 200, 201 (1st Dep't 2002). Indeed, here, petitioner's claim that trial counsel was ineffective for failing to consult an expert was not record-based. There were no facts in the record concerning the reasons, or lack thereof, for counsel's failure to investigate or pursue the consultation of an expert. More importantly, the evidence submitted by Dr. Goldberg was not present in the record on appeal.

Similarly, the motion court's finding that petitioner's other claims of ineffective assistance of counsel were barred was also incorrect.[13] Indeed, because ineffective assistance claims frequently require development of facts not revealed by the

---

[13] Of course, the subset of petitioner's ineffective assistance of counsel claim as raised on direct appeal is not barred because that aspect of the claim was determined on the merits by the appellate court.

trial record, *e.g.*, *Massaro* v. *United States*, 538 U.S. 500, 505-07 (2003); *United States* v. *Doe*, 365 F.3d 150 (2d Cir. 2004); *People* v. *Stultz*, 2 N.Y.3d 277, 284-85 (2004); *People* v. *Rivera*, 71 N.Y.2d 705, 530 N.Y.S.2d 52 (1988); *People* v. *Brown*, 45 N.Y.2d 852, 410 N.Y.S.2d 287 (1978), New York courts often hold that in circumstances like those in the present case in which a subset of ineffective assistance claims raised by § 440 was presented on direct appeal, summary denial pursuant to C.P.L. § 440.10(2)(a) is improper because an ineffective counsel claim raised by a § 440 motion incorporating post-trial facts is different from one limited to the trial record. *E.g.*, *People* v. *Reynolds*, 309 A.D.2d 976, 766 N.Y.S.2d 142 (3rd Dep't 2003); *People* v. *Welch*, 108 A.D.2d 1020, 485 N.Y.S.2d 590 (3rd Dep't 1985); *People* v. *Seminara*, 58 A.D.2d 841, 396 N.Y.S.2d 472 (2nd Dep't 1977).

While a defendant cannot re-litigate claims denied on direct appeal, the errors forming the bases for those claims supported Mr. Bell's claim of cumulative error, which could not have been determined on direct appeal. The errors supporting petitioner's ineffective assistance claims that were decided on appeal were properly before the motion court as evidence that trial counsel's numerous errors had the cumulative effect of depriving Mr. Bell of the assistance of counsel.

Thus, New York law affords a defendant the full and fair opportunity to make a factual record of off-the-record allegations in support of an ineffective assistance of counsel claim, regardless of whether he raised a subset of those claims on direct appeal. Such an opportunity to present a federal constitutional claim is required by due process, *see Kimmelman*, 477 U.S. at 378, and comports with the requirement that courts

81

review ineffective counsel claims under the totality of circumstances, *see Strickland*, 466 U.S. at 668.

## II. Petitioner Was Denied His Right To Due Process Because Insufficient Evidence Was Presented At Trial To Enable Any Rational Trier Of Fact To Conclude Beyond A Reasonable Doubt That A Robbery Occurred

It is well-settled that "the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970); *accord Fiore* v. *White*, 531 U.S. 225, 228-29 (2001) ("[T]he Due Process Clause of the Fourteenth Amendment forbids a State to convict a person of a crime without proving the elements of that crime beyond a reasonable doubt."). In *Jackson* v. *Virginia*, 443 U.S. 307 (1979), the Supreme Court held that state prisoners may raise habeas corpus challenges to state-law convictions based on insufficient evidence. *Id*. at 316 ("We hold that in a challenge to a state criminal conviction brought under 28 U.S.C. § 2254 -- if the settled procedural prerequisites for such a claim have otherwise been satisfied -- the applicant is entitled to habeas corpus relief if it is found that upon the record evidence adduced at trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt."); *accord People* v. *Contes*, 60 N.Y.2d 620, 621 (1983) (quoting *Jackson*).

The standard of review set forth in *Jackson* v. *Virginia* asks whether, after drawing all reasonable inferences in favor of the state, and thus "viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." 443 U.S. at 318-19. The

82

*Jackson* standard thus accords considerable deference to the trier of fact. However, this deference is not unlimited. A guilty verdict must be based on more than a "modicum" of evidence. *See, e.g., United States* v. *Schwarz*, 283 F.3d 76, 105 (2d Cir. 2002) (reversing conviction on insufficient evidence grounds); *see also Richey* v. *Mitchell*, No. 01-3477, 2005 WL 147080 (6th Cir. Jan. 25, 2005); *Garcia* v. *Carey*, No. 02-56895, 2005 WL 107090 (9th Cir. Jan. 20, 2005); *United States* v. *Garth*, 188 F.3d 99 (3d Cir. 1999). *See generally Jackson*, 443 U.S. at 320 (explicitly rejecting pre-*Winship* "no evidence" standard for setting aside convictions because "it could not seriously be argued that such a 'modicum' of evidence could by itself rationally support a conviction beyond a reasonable doubt").

In this case, the state failed to present any evidence sufficient to prove one of the elements of robbery. As a consequence, no rational trier of fact could have found that Mr. Bell was guilty of robbery beyond a reasonable doubt, and due process therefore requires that Mr. Bell's robbery conviction be overturned.

Under section 160.00 of the New York Penal Law, robbery is defined as a "forcible stealing." A person forcibly steals when, in the course of committing a larceny, that person uses or threatens to use physical force to (i) prevent or overcome resistance to the taking, or retaining, of the property; or (ii) compel the owner of the property to deliver up the property or to engage in conduct which aids in the commission of the larceny. P.L. § 160.00. In turn, section 155.05 of the Penal Law defines larceny as the wrongful taking, obtaining, or withholding of property with the intent to deprive another person of that property.

83

Thus, for the evidence to be sufficient to convict a person of robbery, there must be evidence presented that shows, among other things, that the person "took, obtained, or withheld" property. The practice commentary to section 155 explains that a person "takes" property when that person "'exercise[s] dominion and control over the property for a period of time, however, temporary, in a manner wholly inconsistent with the owner's continued rights.'"  P.L. § 155, practice commentary (quoting *People* v. *Jennings*, 69 N.Y.2d 103, 118 (1986)). Specifically, "as to inert objects, such as a wallet, tools, cloths, or books, some movement, however slight, is necessary to show that the purported thief has indeed gained dominion and control of the property."  *Id.* (citing *People* v. *Alamo*, 34 N.Y.2d 453, 458 (1974)).

Under New York law, the sufficiency of evidence is evaluated with reference to how the jury in that particular case is charged. *See People* v. *Malagon*, 50 N.Y.2d 954, 955 (1980); *accord People* v. *Kearse*, 289 A.D.2d 507, 508 (2d Dep't 2001). In this case, the judge instructed the jury on the charge of robbery:

> [T]he first of those elements [of the charge of robbery] requires proof that on or about July 16 1996 in Kings County, the defendant stole property from Mr. Moriah a quantity of US currency, a wallet and identification.
>
> A person steals property when, with intent to deprive another of property or to appropriate it to himself, he wrongfully takes, obtains or withholds such property from an owner thereof; he takes property means to exercise control over it permanently or for some extended period or under such circumstances as to require the major portion of its economic value or benefit....

(Tr. at 969-71)

84

Evidence was presented to show that Mr. Moriah was accosted with a gun and told to hand over his money. (Tr. at 369, 379.) Mr. Moriah then emptied the contents of his pockets, placing the only item, a small black address book, on the hood of an adjacent car. (Tr. at 379.) The state presented no evidence that Mr. Moriah's assailant ever took, moved, or even touched, the address book. The state presented no other evidence related to the black address book or any other property belonging to Mr. Moriah. Crucially, the state put forward *no evidence* that Mr. Moriah's assailant ever took possession or control, even briefly, of the address book that Mr. Moriah had placed on the hood of the car. Moreover, there is no evidence that it was apparent to the assailant that there was money contained within the address book, so it is clear that the assailant had no interest in taking the address book. Accordingly, no rational juror could find that the assailant took Mr. Moriah's property with the intent "to exercise control over it permanently or for some extended period."

Only where a defendant has been shown to actually have taken possession or control of another's property will a court find that a showing of larceny has been made. For example, *Harrison* v. *People*, 50 N.Y. 518 (1872), aptly illustrates the outer limits of what may constitute a taking for larceny purposes. In *Harrison*, the court found that defendant had committed larceny when he had grabbed the victim's wallet and lifted the wallet a few inches, halfway out of the victim's coat pocket, before the victim realized what had happened and grabbed his wallet back. *Id.* at 521; *accord People* v. *Olive*, 52 N.Y.2d 309, 313-14 (1981) (upholding larceny conviction where defendant hid set of wrenches in his jacket pocket and walked towards exit of department store); *People*

85

v. *Dingle*, 122 A.D.2d 280 (2d Dep't 1986) (upholding larceny conviction where defendant carried bag of money to door, even though defendant dropped bag while attempting to get out the door).

These cases make clear that under New York law, a court may only uphold a larceny conviction where the state has established that the defendant actually possessed, however briefly, the property in question. Here, there was no evidence presented to the jury that Mr. Moriah's assailant ever took possession or control of the small black address book that Mr. Moriah placed on the hood of the car. Based on the above, no rational trier of fact could have found that the state proved beyond a reasonable doubt that Mr. Moriah's assailant had, at any point in time, possession or control of his property. As a result, under, there was insufficient evidence to convict Mr. Bell of robbery.

Yet the Appellate Division, on appeal, ruled summarily that the evidence was legally sufficient to sustain a conviction for robbery. *See People* v. *Bell*, 298 A.D.2d 398 (2d Dep't 2002). This decision is an unreasonable application of *Jackson* v. *Virginia* because no reasonable juror could find that the assailant exercised dominion or control over the complainant's property, and thus Mr. Bell's habeas petition must be granted.

86

### Conclusion

FOR THE REASONS STATED HEREIN AND IN THE
PETITION,    THIS    COURT    SHOULD    GRANT
PETITIONER THE WRIT OF HABEAS CORPUS

Date: February 3, 2005                    Respectfully submitted,
      New York, New York


                                          Anne S. Raish (AR 8643)
                                          PAUL, WEISS, RIFKIND, WHARTON &
                                            GARRISON LLP
                                          1285 Avenue of the Americas
                                          New York, New York  10019
                                          (212) 373-3000

                                          Lara M. Shalov (LS 6540)
                                          STILLMAN & FRIEDMAN P.C.
                                          425 Park Avenue
                                          New York, New York 10022
                                          (212) 223-0200

Of Counsel:                               Laura R. Johnson (LJ 4800)
Mark Pomerantz (MP 9156)                  Lawrence T. Hausman (LH 4542)
PAUL, WEISS, RIFKIND, WHARTON &           THE LEGAL AID SOCIETY
  GARRISON LLP                            199 Water St. (5th Floor)
1285 Avenue of the Americas               New York, New York 10038
New York, New York 10019                  (212) 577-7989

                                          Attorneys for Petitioner

87